The STATE of Utah, Plaintiff and Respondent,

v.

Ronald LeMoyne KELLY, Defendant and Appellant.

No. 19253.

Supreme Court of Utah.

May 1, 1986.

David C. Biggs, Salt Lake City, for defendant and appellant.

David L. Wilkinson, Atty. Gen., Earl F. Dorius, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

DURHAM, Justice:

Defendant was charged with first degree murder, a capital offense, under U.C.A., 1953, § 76–5–202(1)(d). After electing to be tried without a jury, defendant was convicted and sentenced to life imprisonment. On appeal, defendant challenges his conviction on the following grounds: improper search and seizure, *Miranda* violations, lack of jurisdiction based on delay in holding a preliminary hearing, and insufficiency of the evidence. For the reasons stated below, we affirm.

In the early morning of February 10, 1982, Salt Lake City police received a report of a disturbance in an apartment house on Sixth South and Fifth East. Police officers responded to the call and found the body of the victim in her upstairs apartment. The victim was partially clothed and had been stabbed numerous times. The victim also had a number of bruises and scrapes on her body, and a toothbrush had been inserted in her vagina. The autopsy later performed on the body indicated that the victim had two vaginal wounds consisting of a cut and a bruise. Also, during the course of the autopsy, three foreign pubic hairs were found on the victim's buttocks.

After discovering the body, police officers spoke with the two residents of the apartment directly below that of the victim. The residents, one of whom had called the police, stated that they had heard a scream and loud noises and later heard footsteps leaving the apartment and going downstairs. They then saw a man, wearing dark pants, light gloves, and a dark ski jacket with a colored design on the back,

standing on the front porch. One of the residents stated that he watched the man leave and walk east on Sixth South.

Because it had snowed earlier that evening, the police found and were able to follow a set of distinct footprints which left the building and headed east. The police followed the footprints, which led intermittently to defendant's residence.

One of the investigating officers, Officer Farnsworth, went to the door of defendant's residence, knocked, and identified himself. Defendant came to the door, and the officer again identified himself and stated that he was investigating a homicide and had followed some footprints from the scene of the crime to defendant's front yard. The officer asked if he could come in, and defendant opened the door and stepped back to let the officer in. As soon as he was inside, the officer noticed a dark blue and beige ski parka with a red stripe lying on the couch by the door. The officer then asked if defendant had been out that night. Defendant stated that he had been to the Tri-Arc and that he had been home for two hours. Defendant, who was in his underwear, then walked into his bedroom to put on some pants, and Officer Farnsworth followed him; at about the same time, two other officers, who had been standing outside, came in the open front door of the residence. Officer Farnsworth later testified that defendant was not under arrest at that point and that Officer Farnsworth followed defendant into the bedroom for self-protection. Officer Farnsworth then asked defendant what shoes he had been wearing that night, and defendant indicated a pair of wet tennis shoes on the floor. The shoes appeared to have an unusual tread that matched the footprints in the snow. Officer Farnsworth asked defendant if he had killed anybody that night, to which defendant responded, "Are you serious?" Shortly thereafter, the officer told defendant that he was going to read defendant his rights, as dictated by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The officer also told defendant that he would have to go to the police station

for questioning. Although the officer was interrupted by defendant, who stated that he was familiar with his rights as he had been on probation, the officer gave defendant a full *Miranda* warning. When asked whether he understood his rights and whether he wanted to answer questions, defendant responded, "I don't know. It depends." The officer then said that he needed a yes or no answer, but defendant did not respond. However, when asked what he had been wearing that night, defendant pointed out a pair of black pants, a black shirt, and some socks, all lying in the bedroom. Officer Farnsworth picked up those items, as well as the tennis shoes and the ski jacket. Defendant then made the following statement, "I want to level with you guys. I do know someone that lives down there." Defendant also indicated that he had been across the street from the victim's building that night. Later, in an interview with detectives, defendant stated that he had been in the victim's building and had gone upstairs to the apartment next door to the victim's apartment because defendant wanted to use a friend's telephone. The man living in that apartment testified, however, that he did not hear anyone knock on his door that night, although he did hear screams.

Before leaving defendant's house, the police conducted a sweep search to determine if anyone else was in the house. There was testimony at the preliminary hearing that defendant gave his permission for the search. Although no one else was found in the house, the officers did find a pair of gloves on the bathroom floor. The gloves, which had dark spots on them, were also taken into evidence.

Defendant was placed in a patrol car and taken to the scene of the crime and then to the police station. While in the car, defendant talked to the officers rather freely. He also asked the officers to handcuff him and, during the stop at the victim's building, defendant became visibly upset when the victim's children were taken away. At that point, defendant made a statement to the effect, "If only Darla had been there."

Darla Cates was a friend of defendant and had been living next door to the victim.

After defendant was taken from his house, the house was secured, and a search warrant was later obtained. The only evidence seized under that warrant which was introduced at trial was a shoelace with human blood on it. Testimony at trial indicated that there were traces of human blood found on defendant's pants, undershorts, parka, gloves, shoes, and the shoelace; the blood on the pants and shoelace was identified by type and enzymes and found to be consistent with the victim's blood and inconsistent with that of defendant. Further, a pubic hair found on the victim's buttock matched a pubic hair sample taken from defendant.

Defendant was convicted of first degree murder based on the aggravating circumstance that the homicide was committed in the course of a rape, attempted rape, or aggravated sexual assault. The trial court sentenced defendant to life imprisonment.

On appeal, defendant first challenges the warrantless seizure of his shoes and other clothing. He argues that although he gave consent for the officer to enter his home, there was no legal authority for the officer to follow defendant into his bedroom. Further, even if Officer Farnsworth had a right to be in the bedroom, the seizure of the shoes did not fall within the plain view exception to the warrant requirement. We disagree.

■ Defendant admitted Officer Farnsworth to his home and made no objection when the officer followed defendant into his bedroom. Having consented to the officer's entry into his home, defendant's expectation of privacy was substantially reduced. Nor was defendant's consent mere acquiescence to perceived police authority. Defendant's reliance on *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20

L.Ed.2d 797 (1968), in this respect is misplaced. In *Bumper*, the officers announced that they had a warrant, and the consent to enter was given on that basis. The Court held that by claiming authority to enter, the police had used coercion which, although lawful, negated the existence of consent. *Id.* at 550, 88 S.Ct. at 1792. In this case, there was no coercion, and defendant freely consented to the officer's entry. Once in the house, the officer was fully justified in following defendant into the bedroom. A police officer may "take necessary measures to neutralize [a] threat of harm...." *State v. Cole*, Utah, 674 P.2d 119, 124 (1983). As the officer had just followed footprints leading from the scene of a grisly homicide to defendant's house and inside the house found a parka closely matching a description given by witnesses, the officer had reason to be concerned about possible danger, and in fact the officer testified that he followed defendant into the bedroom because he feared there might be a weapon there.

■ Defendant next asserts that the officer's warrantless seizure of the shoes was improper because evidence taken in a plain view seizure must be "clearly incriminating," and the shoes "were not obviously contraband or weapons." This argument, however, is unpersuasive. In *State v. Romero*, Utah, 660 P.2d 715, 718 (1983), this Court addressed the requirements for a justifiable "plain view" seizure: (1) lawful presence of the officer; (2) evidence in plain view; and (3) evidence which is clearly incriminating. *Romero* relied on two United States Supreme Court cases: *Washington v. Chrisman*, 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982), and *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality opinion).[1] More recently, in *Texas v. Brown*,

---

1. The doctrine established in *Coolidge* was that there be "a prior justification for an intrusion in the course of which [the officer] came inadvertently across a piece of evidence incriminating the accused.... [It must be] immediately apparent to the police that they have evidence before them...." 403 U.S. at 466, 91 S.Ct. at

2038. *Romero* explicitly omitted the inadvertency requirement. 660 P.2d at 718 n. 3. However, the plain view exception may not be used merely as a pretext for a warrantless search, i.e., where officers know in advance that an item will be present and use that knowledge as justification for a warrantless search and seizure.

460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion), the Supreme Court further examined the plain view doctrine. In *Brown*, the Court stated, "The question whether property in plain view of the police may be seized . . . must turn on the legality of the *intrusion* that enables them to perceive and physically seize the property in question." *Id.* at 737, 103 S.Ct. at 1541 (emphasis added). The opinion expresses concern, however, with the implication of the requirement that the incriminating nature of the item to be seized be "immediately apparent." "[T]he use of the phrase 'immediately apparent' was very likely a very unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view doctrine.'" *Id.* at 741, 103 S.Ct. at 1542. The Court therefore reaffirmed the rule that all that is required is that there be " 'probable cause to associate the property with criminal activity.' " *Id.* at 741–42, 103 S.Ct. at 1543 (quoting *Payton v. New York*, 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980)). Under that standard, an officer must only have a reasonable belief "that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct. . . ." A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." *Brown*, 460 U.S. at 742, 103 S.Ct. at 1543 (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)).

Defendant contends that the only connection between the shoes and the homicide was his pre-*Miranda* admission that he had been wearing the shoes that night. However, this contention ignores the fact that Officer Farnsworth arrived at defendant's house having followed footprints in the snow which were obviously made by some sort of tennis shoe. We believe that the discovery of defendant's wet tennis shoes in plain view on the bedroom floor satisfies the standard set out above, irrespective of any statement made by defendant. Therefore, we find that the seizure of defendant's shoes was proper.

■ Defendant similarly challenges the warrantless seizure of the pants and gloves. In regard to the pants, defendant claims that as the bloodstains on the pants were not apparent until after they were seized and analyzed, the only connection between the pants and the homicide was defendant's statement, made after he had been given a *Miranda* warning, that he had been wearing them. As defendant challenges the validity of his waiver of *Miranda* rights (see below), he claims that the pants were illegally seized. However, the pants were a dark color, thus matching the description given by the witness, and were lying discarded near defendant's bed, indicating that they had been recently worn; thus, even assuming that defendant's statement must be disregarded, the foregoing facts were sufficient to provide the officer with a reasonable belief that the pants might be "useful as evidence of a crime," *Brown*, 460 U.S. at 742, 103 S.Ct. at 1543, because it would be routine procedure to check clothing for blood stains in a crime such as this one.

■ Defendant's argument against the seizure of the gloves is similarly unpersuasive. Defendant claims that the gloves were seized pursuant to an illegal search of the rest of his home and that the gloves were not obviously incriminating until after they had been picked up and the officer

---

*See State v. Harris*, Utah, 671 P.2d 175 (1983). In *Harris*, we said, "The 'plain view' doctrine comes into play only where the observation made is postintrusive." *Id.* at 181. In that case, the officers knew there was marijuana growing on the premises, but they could not see the plants until, without a warrant, they entered onto the property, despite the owner's request that they leave. We therefore rejected the State's contention that the plants were legally seized pursuant to the plain view exception "because the evidence was not discovered incident to a prior justified intrusion, but was instead the result of an uninvited entry by which the police officers achieved 'plain view.' " *Id.* In this case, however, the discovery of the evidence was made incident to a prior intrusion based on consent.

identified dark spots on them. Before leaving defendant's apartment, the officers briefly surveyed the house to determine if anyone else was there. Such action is known as a protective sweep and has been upheld as a security measure. *See United States v. Briddle,* 436 F.2d 4, 7 (8th Cir. 1970), *cert. denied,* 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 824 (1971); *see also United States v. Agapito,* 620 F.2d 324, 335–36 (2d Cir.1980), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980);[2] 2 W. LaFave, *Search and Seizure* § 6.4(c) (1978). The gloves were discovered in plain view during the sweep. As the description given by the witnesses stated that the assailant had been wearing gloves and as the dark specks were apparently visible, the officer was also justified in seizing the gloves.

■ Defendant next argues that from the moment the officer entered defendant's home, defendant was subjected to custodial interrogation and that any statements made prior to the *Miranda* warning should be suppressed as a violation of defendant's rights. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, it is undisputed that during the period in question, defendant was not under arrest. This Court has previously established the most significant factors to be used in determining whether an individual who has not been arrested has been subjected to custodial interrogation: "(1) the site of interrogation; (2) whether the investigation focused on the accused; (3) whether the objective indicia of arrest were present; and (4) the length and form of interrogation." *Salt Lake City v. Carner,* Utah, 664 P.2d 1168, 1171 (1983). Although custodial interrogation may take place in one's own residence, *see, e.g., Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095,

22 L.Ed.2d 311 (1969), the fact that defendant was in his own home and had consented to the officer's entry, as well as the absence of any coercive or compulsive strategy on the officer's part, simply does not suggest the type of abuse *Miranda* is intended to prevent. *See State v. Martinez,* 23 Utah 2d 62, 64–65, 457 P.2d 613, 614–15 (1969). Next, it cannot be said that the investigation had focused on defendant until sometime later when the officers established that no one else was in the residence and that defendant had been wearing clothing similar to that described by witnesses. Nor were there any objective indicia of arrest such as "readied handcuffs, locked doors or drawn guns," *Carner,* 664 P.2d at 1171. Finally, the interrogation was brief and was, initially, investigatory rather than accusatory. When the officer entered the house, he did not have probable cause to arrest, and his objective was to investigate. In the following few minutes, that objective changed and defendant was given a *Miranda* warning and taken into custody. This occurred after the officer had had an opportunity to examine defendant's tennis shoes and determined that the shoes' tread matched that of the footprints leading from the scene of the crime. We therefore conclude that defendant's argument, which would have us rule that defendant should have been given a *Miranda* warning as soon as he consented to the officer's entry into the house, is without merit. *Cf. State v. Meinhart,* Utah, 617 P.2d 355 (1980). We also note that as we have determined that the admission of defendant's tennis shoes was proper based on the plain view exception, the only pre-*Miranda* statements used at trial were foundational and served merely to establish the extent of

---

**2.** In *Agapito,* 620 F.2d at 324, the court found that the warrantless entry into a hotel room could not be justified as a security check where the arrests had been made in the lobby seventeen floors below, the room had been under surveillance for two days and the agents knew the room was empty, and the agents remained in the room for twenty-four hours following the entry. The court also indicated, in a footnote,

that failure to make an immediate sweep of the premises undermines the claim of a valid security check. *Id.* at 335–36 n. 15. We do not believe, however, that to be valid a protective sweep must always occur immediately upon entry. Instead, each situation must be evaluated on the basis of the facts and circumstances involved.

conversation that had occurred prior to the *Miranda* warning.

▮▮ Defendant's next claim is that he did not make a valid waiver of his rights under *Miranda* and that therefore all statements made following the warning should be suppressed. Waiver of *Miranda* rights must be voluntary, knowing, and intelligent. *See State v. Newton*, Utah, 682 P.2d 295, 296 (1984), and cases cited therein. In this case, defendant stated that he knew his rights and interrupted the officer as he was reading the obligatory warning. The officer nevertheless completed the warning and asked defendant if he understood his rights and whether he wanted to answer questions. Defendant then gave an equivocal answer, stating, "I don't know. It depends." Under these circumstances, we do not believe that it was improper for the officer to ask further questions. Shortly thereafter, defendant spontaneously said that he wanted "to level with" the officers and stated that he knew people in the apartment building where the murder had occurred and that he had been across the street from the building that night. Following a suppression hearing, the trial court specifically found that *Miranda* rights had been given, that defendant had acknowledged that he understood the rights, and that defendant's statements were voluntary and admissible. Similarly, at trial, the court overruled defendant's objections relating to this issue. In *State v. Meinhart*, Utah, 617 P.2d 355 (1980), we said that it is the district court's "duty and prerogative ... to determine the question of the voluntariness of a waiver of the right to remain silent and to have counsel," and because of that court's advantaged position, we reverse such a ruling only where clear error or abuse of discretion has been shown. *Id.* at 357–58 (footnotes omitted). Neither infirmity has been established in the case before us.

▮▮ Defendant makes several arguments relating to suppression of evidence obtained through execution of the search warrants in this case. His first argument attacks the search warrants because the probable cause for their issuance involved defendant's shoes which he claims were improperly seized. Based on our previous determination that the shoes were properly seized, this argument is without merit. Defendant also urges this Court to require suppression of the evidence obtained pursuant to the warrants because defendant's house was illegally searched and impounded following his arrest. In this regard, defendant contends that because there were no exigent circumstances to justify that action, the warrantless securing of the premises was illegal and the subsequently issued search warrants do not cure the error. However, because we have determined that the sources of the warrants were independently legal and unrelated to the impounding of the house, we find no reason to order suppression of the evidence obtained pursuant to the valid search warrants. *See Segura v. United States*, 468 U.S. 796, ——, 104 S.Ct. 3380, 3391, 82 L.Ed.2d 599 (1984). Additionally, defendant argues that in executing the warrants, the police seized several items which were not listed in the warrants. However, none of the items defendant complains of was introduced at trial; we therefore find no error. Similarly, an incorrect street number on one of the warrants, which was later corrected, does not invalidate the warrants or require suppression of a bloodstained shoelace, the only item seized pursuant to the warrants which was introduced at trial. Considering that the correct address appeared on the attached affidavit, as well as on the other warrants and corresponding affidavits, the defect was minimal. "Minor technical deficiencies in the warrant's description," *State v. Anderson*, Utah, 701 P.2d 1099, 1103 (1985), should not invalidate an otherwise proper search. *See id. See also State v. Anderton*, Utah, 668 P.2d 1258, 1262 (1983) (failure of magistrate to return search warrant to the court within statutory time limit did not affect validity of warrant).

▮▮ Defendant next argues that the information charging him with capital homicide should have been dismissed based on

lack of jurisdiction because his preliminary hearing was not held within ten days pursuant to U.C.A., 1953, § 77–35–7(c). The information was filed on February 11, 1982, defendant was arraigned on February 12, and his preliminary hearing was held on April 4, 1982, following two continuances. The first continuance was apparently granted because the State had not yet received certain evidence which had been sent to the FBI for analysis. The second was granted because the assigned judge was unavailable. Defendant first filed a motion to dismiss on April 5, which was denied by the circuit court, although a transcript from that hearing has not been provided. On December 7, defendant again brought a motion to dismiss and the district court determined that a ruling had already been made on that motion.

The record on this issue is not entirely clear and provides an incomplete basis on which to fully examine defendant's claim. In such circumstances, we generally assume the validity of the actions of the court below. *State v. Seymour*, 18 Utah 2d 153, 155, 417 P.2d 655, 657 (1966). Presumably, the continuances were granted based on what the court determined to be good cause and, in the absence of record evidence to the contrary, we cannot say that those determinations amounted to abuse of discretion.

▮ Defendant, however, contends that the error was jurisdictional and on that basis requires dismissal. In support of his argument on appeal, defendant relies on *State v. Moore*, Utah, 521 P.2d 556 (1974), which involved the application of a former statute, U.C.A., 1953, § 77–65–1(a) (repealed 1980) (current version at U.C.A., 1953, § 77–29–1 (1982)). That statute dealt with a prisoner's demand for disposition of charges pending against him, i.e., the right to have the charges brought to trial within ninety days. In the event that the action was not brought to trial within the time provided, former section 77–65–2 specifically stated that the court would lose jurisdiction. Further, in both the former statutory material and the current version, which

provides for disposition within 120 days, there is a provision for dismissal of the charges with prejudice if, in the absence of good cause, the time limit is not met. The statute at issue in this case, however, contains no similar provisions and relates to a different phase of the criminal process. Therefore, defendant's reliance on *State v. Moore* is misplaced.

In *State v. Poteet*, Utah, 692 P.2d 760 (1984), we dealt with the application of section 77–35–7(c). We noted that although article I, section 13 of the Utah Constitution guarantees the right to a preliminary hearing, section 13 does not specify a time within which the hearing must be held; and while section 77–35–7(c) specifies a time limit, it does not provide a remedy for a violation of the limit. 692 P.2d at 764. In *Poteet*, the Court found that in the absence of prejudice to the appellant a violation of Rule 7(c) did not warrant reversal. *Id.* at 765. In that case, however, it was clearly established that the appellant had remained in custody on other charges irrespective of when the preliminary hearing on this charge was held. *Id.* In the case before us, the record indicates that defendant similarly would not have been released prior to the preliminary hearing because of a parole violation. Nonetheless, we have recently observed that in a case where the only possible prejudice to a defendant was a brief period of detention prior to preliminary hearing, "[i]n light of the subsequent conviction, that temporary period of possibly wrongful detention is of minimal significance and does not warrant a reversal of an otherwise valid conviction." *State v. Schreuder*, Utah, 712 P.2d 264, 272 (1985). *See also Gerstein v. Pugh*, 420 U.S. 103, 119, 95 S.Ct. 854, 865, 43 L.Ed.2d 54 (1975). In *State v. Seymour*, 18 Utah 2d 153, 156, 417 P.2d 655, 658 (1966), this Court determined that reversal is not warranted "unless there was a significant failure or abuse of due process of law, or unless there was an error or defect which it could reasonably be supposed put the defendant at some substantial disadvantage, or had some substantial prejudicial effect upon his rights." (Footnote omitted.) Even assum-

ing that there was a defect in the pretrial procedure followed in this case, it was not such as to meet that standard and require reversal.

■ Finally, defendant challenges the sufficiency of the evidence to convict him of first degree homicide and argues that it was error not to dismiss the aggravating circumstances with which defendant was charged. In disputing the existence of the aggravating circumstances, defendant indicates that there was insufficient evidence to establish that a rape had occurred and contends that the only evidence which links him with a rape or attempted rape is a single Negroid hair. However, while defendant emphasizes that there was no external vaginal bruising and no evidence of sperm or seminal fluid in the victim's vagina, he ignores the testimony which established that the absence of those factors does not rule out the occurrence of rape, let alone attempted rape. Further, the medical examiner found two internal vaginal injuries: a bruise and a cut. In all likelihood, the cut was caused by the toothbrush and, although it was possible that the bruise could have been caused by the toothbrush as well, it was similarly possible that the bruise could have been caused by the insertion of a penis. More significantly, defendant's undershorts had blood on them, as did the victim's underpants, which were found a few feet from the body.

Although defendant disputes the validity of the pubic hair evidence, the State's expert witness testified that the hair found on the victim's buttock was a Negroid pubic hair that had been forcibly removed. The expert stated that the hair was indistinguishable from the pubic hair sample taken from defendant. Further, the expert testified that in his experience there were only two out of 10,000 cases where hairs from two separate individuals were indistinguishable. Although hair samples are unlike fingerprints in that a positive identification cannot be made, the expert testified that to have come from someone other than defendant, that person's hair would have to have "exactly the same twenty characteristics [on which the comparison was made] and exactly the same arrangement as did Mr. Kelley's [sic] hair." And that person would have had to have been in a place where the hair could be deposited where the hair in this case was found. In response, the defense presented some evidence which tended to contradict the State's expert. However, the finder of fact was free to weigh the merits of the conflicting evidence presented and to draw its own conclusion. *State v. Wulffenstein,* Utah, 657 P.2d 289, 292 (1982), *cert. denied,* 460 U.S. 1044, 103 S.Ct. 1443, 75 L.Ed.2d 799 (1983).

As defendant bases his claim of error relating to the aggravating circumstances on sufficiency of the evidence, we apply a strict standard, which is that the evidence must be so lacking or insubstantial that reasonable minds could not possibly have found defendant guilty beyond a reasonable doubt. *State v. Howell,* Utah, 649 P.2d 91, 97 (1982). Although the evidence of rape, attempted rape, or aggravated sexual assault is not fully conclusive, "[i]t is not sufficient that on appeal an appellate court views the evidence as less than wholly conclusive." *Id.* The determination that a pubic hair found on the victim's unclothed buttock matched the pubic hair of defendant, the location and condition of the victim's underpants, as well as the discovery of blood on defendant's undershorts, lead us to conclude that there was sufficient evidence to establish the existence of the aggravating circumstances and that the trial court did not err in refusing to dismiss them.

In a related argument, defendant contends that there was insufficient evidence to find him guilty of first degree homicide. Defendant argues that the next-door neighbor to the victim had access to her apartment and had a possible motive for harming her. Defendant also points out that the blood found on his clothing, while inconsistent with his blood and consistent with that of the victim, was also consistent with the blood of a large segment of the population. As well, the pubic hair found

on the victim's buttock could have been transferred by static electricity and could have come from someone else with hair characteristics similar to those of defendant. However, as noted above, the standard of review on such a claim is very strict. In view of the evidence presented in this case, including the description given by witnesses who saw the assailant leaving the building and the discovery at defendant's home of clothing which matched the description, the footprints leading to defendant's home and defendant's possession of shoes which matched those footprints, as well as the blood and pubic hair evidence, we cannot say that the evidence was so insubstantial as to warrant reversal.

Having considered all of defendant's claims, we find no basis for reversal. Accordingly, defendant's conviction is affirmed.

HALL, C.J., and STEWART, HOWE and ZIMMERMAN, JJ., concur.