STATE of Utah, Plaintiff and Respondent,

v.

Julio Gary VALDEZ, Defendant and Appellant.

No. 19579.

Supreme Court of Utah.

Dec. 28, 1987.

Lynn R. Brown, Brooke C. Wells, Salt Lake City, for defendant and appellant.

David L. Wilkinson, Dave B. Thompson, Salt Lake City, for plaintiff and respondent.

DURHAM, Justice:

Defendant appeals from two first degree murder convictions for the deaths of Carolyn Swan, defendant's former girlfriend, and her son, Christopher. Defendant was Christopher's putative father. Following a jury trial, defendant was sentenced to two consecutive terms of life imprisonment.

In this appeal, defendant raises six claims of reversible error: (1) insufficiency of the evidence to prove all of the elements of first degree murder in the death of Christopher Swan, (2) insufficiency of the evidence to establish either of the aggravating circumstances charged in the death of Carolyn Swan, (3) improper admission of photographs of the victims' bodies, (4) improper admission of evidence obtained during the execution of two search warrants, (5) "death qualification" of the jury, and (6) failure to quash the jury venire based on systematic exclusion of racial and ethnic minorities. We affirm the convictions.

Defendant and Carolyn Swan had been intermittently involved for several years prior to October 1981, when Carolyn gave birth to Christopher. Six months before Christopher's birth, defendant started dating another woman, April Alkire. Defendant and April subsequently lived together and then became engaged, although defendant continued to have some contact with Carolyn. In the period prior to the deaths of Carolyn and Christopher, there were apparently several extremely unpleasant confrontations involving defendant, April, and Carolyn, and April had become insistent that defendant resolve the situation.

At one point, Carolyn initiated a paternity action against defendant, but later abandoned it. However, because Carolyn was receiving public assistance for herself and Christopher, the State of Utah filed a similar action against defendant. Although defendant was never formally served in the State's paternity action, he had been contacted by the Utah Department of Social Services prior to the murders of Carolyn and Christopher, had denied paternity, and had provided the Department with an incorrect address for service of process.

In August 1982, Carolyn and Christopher were living with Carolyn's parents in Murray, Utah. On August 12, Carolyn spoke with defendant at least once and made arrangements to meet him after midnight when defendant finished his shift at work. At 11:30 p.m., Carolyn told her parents that she was going out to meet defendant. When Carolyn and Christopher failed to return home by the next morning, Carolyn's parents contacted the police, who began an investigation.

On August 13, the police contacted defendant, who denied having seen Carolyn the night before. Instead, defendant and April both stated that after defendant came home from work, they had dinner, drove to April's parents' house to exchange defendant's truck for another car, and then came home and were together all night. On August 15, apparently with consent, the police searched defendant's truck and took soil samples from the fenders and debris from the floormats. On August 16, defendant's truck was impounded for improper registration. A search warrant was obtained on August 18, and the police conducted a further search of the truck, taking another set of soil samples at that time.

On August 19, Christopher's body was found in the Jordan River, lodged against the flood gates near 2100 South. The medical examiner determined the cause of death to be drowning. Carolyn's body was found on August 22, lying near some bushes sixty-five feet from a road in Lark, Utah. Carolyn had been shot twice and then dragged from the road.

Following the discovery of Christopher's body on August 19, defendant and April were arrested at their residence. After receiving immunity, April gave the police permission to search the house where she and defendant lived. The following day, the police obtained a search warrant. Using the key which April had given them, the police searched the residence and took a rifle case and several live .270 caliber cartridges from the apartment.

In addition to giving consent for the search of her apartment, following the grant of immunity, April changed her statement about what had occurred on August 12. Although she was not always a cooperative witness, April testified that on August 12, defendant had called her on the telephone and said, "All your problems are over. Mine have just begun." She stated that on the same day, she noticed that defendant's gun was missing. She further testified that she went to bed at 11:00 p.m. on August 12, before defendant returned home, and awakened early the next morning to find defendant sitting on the couch. Defendant told her that he had driven to Lark with Carolyn and Christopher and that a man had appeared, shot Carolyn, and taken the baby. Defendant then drove home. Following that conversation, April and defendant had constructed an alibi according to which April and defendant were together all night after defendant returned home from work.

At trial, defendant took the stand and testified that April and her mother had made arrangements to have an unidentified man threaten Carolyn and thereby scare her into leaving defendant and April alone. Defendant stated that in the early morning of August 13, he, Carolyn, and Christopher were in Lark. A man with a rifle approached defendant's truck and asked for identification. After defendant and Carolyn got out of the truck, Carolyn began to argue with the man, and the man shot Carolyn and took Christopher, telling defendant not to worry, that he was not supposed to get hurt, and that April's mother did not want him hurt. Defendant then started to drive home; on the way, he was stopped by a police officer for a traffic offense. Defendant also testified that the next day his gun, a .270 caliber rifle, was missing. When he asked April about it, she told him that it was at her mother's house and that April would destroy it. Defendant stated that he watched April cut the gun into small pieces with a hacksaw and take it away.

Testimony at trial established that lead fragments taken from the crime scene came from the same batch of lead as the lead in some of the cartridges taken from defendant's home. Similarly, the marks on the spent bullet cartridge at the scene matched marks on three of the cartridges found at defendant's home, indicating that the cartridges had been in and out of the same firearm. Further, a mineralogist testified that it was "reasonably probable" that the soil sample taken from defendant's truck on August 15 and the soil sample taken from the crime scene had come from the same place.

Evidence at trial also showed that on the night Christopher and Carolyn disappeared, defendant punched out on a time clock at his job at 12:06 a.m. Defendant worked at 4901 West 2100 South. At 1:30 a.m., defendant was pulled over by a police officer at 7000 South 3200 West for failing to stop at a stop sign. Defendant was alone in his truck at that time.

There was conflicting testimony as to whether defendant could have left work at 12:06 a.m., driven to Murray, picked up Carolyn and Christopher, driven to Lark, shot Carolyn and dragged her body sixty-five feet, driven to the spot where the Jordan River crosses 7200 South, thrown Christopher into the river, and then arrived by 1:30 a.m. at the intersection of 3200 West and 7000 South, where defendant was

stopped by police. Nonetheless, the jury found defendant guilty of first degree murder on both counts.

## Sufficiency of Proof

Defendant argues that the evidence was insufficient to support his conviction for Christopher's murder. Specifically, he asserts that the State did not prove that he killed Christopher or, alternatively, that the State did not prove that he intentionally killed Christopher. Defendant also asserts that the State failed to prove the existence of the aggravating circumstances under which defendant was charged with first degree murder, i.e., it failed to prove that defendant committed another murder at the time either Christopher or Carolyn was killed, that the murders were committed for pecuniary or other personal gain, or that Christopher and Carolyn were murdered so they could not provide evidence.

On appeal, defendant attacks the credibility of certain state witnesses and in essence argues that the jury erred in accepting their testimony. "It is the exclusive function of the jury to determine the credibility of the witnesses and to weigh the evidence." *State v. Showaker,* 721 P.2d 892, 893 (Utah 1986). Therefore, in reviewing the sufficiency of evidence, we must consider the evidence in the light most favorable to the jury verdict. We overturn the verdict "only when the evidence is so lacking and insubstantial that a reasonable person could not have reached that verdict beyond a reasonable doubt." *See State v. Dumas,* 721 P.2d 502, 504 (Utah 1986) (quoting *State v. Isaacson,* 704 P.2d 555, 557 (Utah 1985)).

Viewed according to this standard, the evidence is sufficient to support defendant's conviction. April testified that defendant's gun was missing from their apartment on the day of the murder and that defendant called her at work on the day of the murder to tell her, "All your problems are over. Mine have just begun." April did not see defendant from the morning of the 12th, when they argued about Carolyn, until 5:30 a.m. the next day. The testimony of an expert witness at trial established that lead fragments taken from

the scene of Carolyn's murder matched the lead in cartridges taken from defendant's apartment. Mud on defendant's truck matched mud at the scene of Carolyn's murder. A police officer testified that he had made a number of timed runs assuming that Carolyn and Christopher were seen at an intersection by a witness at about 12:15 a.m. and that defendant was alone when he was stopped for running the stop sign at 1:30 a.m. The officer testified that within the time frame set by those events it was possible for defendant to have shot Carolyn in Lark and thrown Christopher in the Jordan River where it crosses 7200 South. A witness for the State testified that a body thrown in the Jordan River at 7200 South could have come to rest where Christopher's body was found. This testimony was vigorously controverted by the defense, which offered contradictory testimony on both points. The mere existence of the contrary evidence does not warrant disturbing the jury's verdict. It was the jury's function "to weigh the conflicting evidence presented and draw its own conclusions." *State v. Pierce,* 722 P.2d 780, 782 (Utah 1986). The jury apparently found the evidence presented by the State credible. "The jury need not accept the version of the facts advanced by a defendant's witnesses, but may disregard them in whole or in part." *Id.* at 781. We cannot say that the evidence as found by the jury was so lacking and insubstantial that a reasonable person could not have found defendant guilty beyond a reasonable doubt of killing Carolyn and Christopher.

We also reject defendant's claim that the jury could not have properly found that he intentionally murdered Christopher. "Intent is an element that often can be proved only by means of circumstantial proof." *State v. Dumas,* 721 P.2d 502, 504 (Utah 1986). In this case, we think the State offered proof from which intent could be inferred. We note that on appeal defendant does not seriously rely on his assertion that a "hit man" killed Carolyn and then took Christopher. Defendant's version of the facts was, however, placed before the

jury for its consideration in determining defendant's guilt. The State demonstrated that defendant was named as Christopher's father in a paternity action brought by the State, but that defendant had not yet been served in that case. Previously, defendant had also been named as Christopher's father in a private paternity action brought by Carolyn. Further, the jury was given evidence from which it could infer that the very existence of Carolyn and Christopher was a source of friction and embarrassment to defendant and therefore that he had a motive for killing them. Further, assuming the jury believed, as it apparently did, the evidence indicating that defendant killed Carolyn and Christopher, it is difficult to imagine a scenario in which defendant threw the still-living Christopher into the Jordan River without doing so with knowledge or intent.

█ We are also unpersuaded by defendant's argument that the State failed to prove the aggravating circumstances necessary for a first degree murder conviction. If the jury accepted the State's version of the events, it could have found for purposes of Utah Code Ann. § 76–5–202(1)(b) that Christopher and his mother were killed "at the same time." While the evidence does not indicate that Carolyn and Christopher were killed at the same moment, the jury could have found that they were killed at about the same time and as part of the same episode or scheme. We note that Utah Code Ann. § 76–5–202(1)(b) was rewritten in 1983 to clarify the scope of the aggravating circumstance. Section 76–5–202(1)(b) now provides, "The homicide was committed incident to one act, scheme, course of conduct, or criminal episode during which two or more persons are killed." The other aggravating circumstances were adequately proved by the evidence that defendant was concerned about the paternity action pending against him—an action in which both Carolyn and Christopher would probably have provided evidence establish-

ing defendant's paternity, thereby subjecting him to liability for support.

### Admission of Photographs

█ Defendant challenges the admission of two photographs: one of Christopher's body and one of Carolyn's.[1] Defendant argues that the probative value of the photographs was outweighed by their potential for unfairly prejudicing the jury.

Utah Rule of Evidence 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence.

Defendant alleges that the photographs have no probative value and are "shockingly gruesome." The resolution of such issues is one within the discretion of the trial judge, *State v. Garcia*, 663 P.2d 60, 64 (Utah 1983) (decided under previous Utah R.Evid. 45), whose decision this Court will overrule on appeal only if any abuse of discretion created a likelihood that injustice occurred. *State v. Royball*, 710 P.2d 168, 169 (Utah 1985); *State v. Jensen*, 727 P.2d 201, 203 (Utah 1986).

That discretion is especially germane whenever the prosecution proposes to admit gruesome color photographs of the body of a homicide victim. In all such cases, the court should determine whether the viewing of the photographs by the jury would create a substantial danger of undue prejudice against the defendant, and if so, whether that danger substantially outweighs the photographs' *essential* evidentiary value. The more inflammatory the photograph, the greater the need to establish its essential evidentiary value....

*Garcia*, 663 P.2d at 64. As with any inquiry under rule 403, the Court must undertake a balancing test, weighing the photographs' essential evidentiary value

---

1. In his brief, defendant also challenges the admission of a close-up photograph of a watch on Carolyn's wrist. The record reveals that defendant's trial counsel made no objection to the admission of the photograph of Carolyn's wrist. Therefore, we do not address the issue on appeal.

against any potential for unfair jury prejudice. *State v. Cloud,* 722 P.2d 750, 752 (Utah 1986). Photographs whose gruesome nature outweighs their evidentiary value must be excluded from trial. However, photographs that are only negligibly gruesome have little potential for unduly prejudicing the jury, and their admission therefore does not constitute an abuse of the court's discretion.

In this case, we find no abuse of discretion. The photographs were not particularly bloody or gruesome and were shown on a large piece of cardboard in an array that included nonobjectionable photos, thereby greatly minimizing the challenged photos' visual impact. Furthermore, the pictures of Christopher were useful in illustrating testimony that Christopher was still alive when he was thrown into the river, a fact indicative of his killer's state of mind. The photographs also indicated the length of time the body had been in the water and thus helped to establish that Christopher had been killed at approximately the same time as his mother. That theory was also corroborated by the photographs showing that Christopher was wearing the same clothes he had on when his mother took him to meet defendant. Abrasions on Christopher's head indicated that his body had traveled downstream to the location where it was found, a point corroborative of the State's theory that Christopher was thrown into the river at 7200 South. The photograph of Carolyn's body shows that the body had been placed under scrub oak trees, suggesting an attempt to hide the body. The fact that the evidence gleaned from the photographs could also have been provided by purely testimonial sources does not by itself prevent the trial judge's admission of the photographs. *State v. Garcia,* 663 P.2d 60, 63 (Utah 1983); *cf. State v. Cloud,* 722 P.2d 750, 752 (Utah 1986).

In short, we do not think that the trial judge abused his discretion in admitting the photographs. Moreover, any arguable error was harmless in light of the noninflammatory nature of the pictures and the lack of emphasis given them by the State.

*Admission of Evidence*

Defendant contends that the trial court committed reversible error in admitting certain evidence which, according to defendant, was illegally seized. The challenged evidence consists of soil samples taken from defendant's truck and a gun case and shell casings taken from defendant's residence. Defendant asserts that the evidence was seized pursuant to two warrants which were defective and prepared in bad faith. Defendant's contentions are unpersuasive.

On August 15, police officers searched defendant's truck, which was parked at April's parents' home, seized several items from inside the truck, and took soil samples from the wheel wells of the truck. This search occurred following a conversation with defendant at his residence. The officers testified that this search was conducted with defendant's consent, and defendant has not presented a challenge to that consent. Subsequently, the police impounded defendant's truck for improper registration, a search warrant was obtained, and more soil samples were taken from the truck on August 18. Both sets of soil samples were then compared to samples taken from the scene of the crime, and an expert testified that there was a "reasonable probability" that all of the samples came from the same source.

Defendant's challenge to the admission of the soil evidence, which tended to show that defendant's truck had recently been in Lark where Carolyn's body was found, must fail. Defendant's own testimony established that he was present in Lark when Carolyn was shot. The admission of the soil sample evidence, therefore, was merely cumulative and not prejudicial. Even if, as defendant appears to argue, he could have avoided testifying if the soil sample evidence had not been admitted, he still cannot prevail. As noted earlier, two soil samples were taken from defendant's truck: the first on August 15 with defendant's consent and the second on August 18 pursuant to the challenged search warrant. Since defendant has not challenged the consent to search his truck and there is nothing in the record to substantiate such a

challenge, we find that the August 15 soil sample was properly admitted. The expert specifically testified about the similarity between the August 15 sample and the sample taken from the crime scene. Thus, even if the August 18 sample should not have been admitted, its use was harmless.

Defendant also challenges the admission into evidence of a gun case and shell casings. Defendant contends that the evidence was seized pursuant to a defective warrant and, further, that the consent given by April to search the house in which defendant and April lived was not voluntary and therefore not valid. Because we find that there was valid consent to search the residence, we need not consider the validity of the warrant.

Defendant contends that prior to giving consent, April was subjected to egregious police misconduct, including hours of interrogation without an attorney present, during which time April was wearing only a robe, as well as threats by police regarding the treatment she would receive if she were convicted and sent to prison. Defendant argues that, because of these coercive circumstances, April's consent cannot be considered voluntary.

 The voluntariness of consent is a question for determination by the trial court. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *see also People v. Brewer,* 690 P.2d 860, 864 (Colo.1984). In this case, the record indicates that on August 19, following the discovery of Christopher's body, both defendant and April were taken into custody. The police arrived at the residence at approximately 11:00 a.m., and April, having just showered, was wearing a robe. Both defendant and April stepped outside to talk to the police. Neither was allowed to go back into the house, and therefore April was unable to change. Although it was approximately two hours before April had an attorney present, April's parents arrived before then with a change of clothes. At some point, a grant of immunity was prepared and, after discussion with and advice from her attorney, April accepted the grant of immunity and was interviewed by the police. During that interview, at which her attorney was present, April consented to the search of the residence. Furthermore, all of the officers who testified denied having made any threats regarding punishment or consequences of imprisonment. Thus, the trial court had before it ample testimony regarding April's representation by an attorney at the time she consented to the search to conclude that her consent was voluntary. Additionally, there was some evidence that it was not until the following night, when April was allowed to return to the apartment to retrieve her belongings, that she physically handed the apartment keys over to the police and then walked away, leaving the police to search the residence. Under these circumstances, we cannot say that the consent to search was invalid or that the trial court abused its discretion. Furthermore, having been given full access to the home, the police were justified in seizing the rifle case and the cartridges, because the officers clearly had "probable cause to associate the property ... with criminal activity." *State v. Gallegos,* 712 P.2d 207, 210 (Utah 1985). In *Gallegos,* we held improper the seizure of a video cassette recorder which was not listed in a warrant. In that case, the officer "only had reasonable suspicion to believe that the recorder was stolen *after [making further inquiry]." Id.* at 211 (emphasis added). In *State v. Kelly,* 718 P.2d 385 (Utah 1986), however, the police entered into the defendant's home pursuant to consent, and this Court upheld the admission of evidence which was in plain view because there was probable cause to associate certain items with criminal activity. *Id.* at 390. Similarly, in this case, the police were justified in seizing the gun case and the cartridges because of the connection between the items and the criminal activity. We therefore conclude that the evidence obtained in the search of the residence was properly admitted.

### Death Qualification of the Jury

 Defendant argues that his constitutional rights were violated because he was tried by a "death-qualified" jury, i.e., a jury from which jurors who stated on voir dire that they would never impose the death penalty had been excluded. *See* Utah Code

Ann. § 77–35–18(e)(10) (1982) (authorizing the removal for cause of jurors who would never impose the death penalty). Defendant claims that the resultant jury was not representative of the community at large and was more prone to convict than juries that have not been death qualified. Since defendant filed his brief, the United States Supreme Court has considered and rejected both these claims under the federal constitution in *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).[2] Based upon *Lockhart,* we reject defendant's claims on this issue.

The Supreme Court viewed with skepticism the studies offered by the defendant in *Lockhart* to demonstrate that death-qualified juries are more likely to convict, but found that even assuming the truth of the defendant's assertion, his argument was not valid. The Court stated that "an impartial *jury* consists of nothing more than *'jurors* who will conscientiously apply the law and find the facts.'" *Id.* at ——, 106 S.Ct. at 1767, 90 L.Ed.2d at 151 (quoting *Wainwright v. Witt,* 469 U.S. 412, 423, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985)). It further reasoned:

> The view of jury impartiality urged upon us by [defendant] is both illogical and hopelessly impractical. [Defendant] characterizes the jury that convicted him as "slanted" by the process of "death qualification." But [defendant] admits that exactly the same twelve individuals could have ended up on his jury through the "luck of the draw," without in any way violating the constitutional guarantee of impartiality. Even accepting [defendant's] position that we should focus on the jury rather than the individual jurors, it is hard for us to understand the logic of the argument that a given jury is unconstitutionally partial when it results from a State-ordained process, yet impartial when exactly the same jury results from mere chance. On a more practical level, if it were true that the Constitution required a certain mix of individual viewpoints on the jury, then trial judges would be required to undertake the Sisyphean task of "balancing" juries, making sure that each contains the proper number of Democrats and Republicans, young persons and old persons, white-collar executives and blue-collar laborers, and so on. Adopting [defendant's] concept of jury impartiality would also likely require the elimination of peremptory challenges, which are commonly used by both the State and the defendant to attempt to produce a jury favorable to the challenger.

*Lockhart,* at ——, 106 S.Ct. at 1767, 90 L.Ed.2d at 151.

The Court also rejected the defendant's argument that death-qualified juries are unconstitutional because they do not represent a fair cross-section of the community. The Court commented first that the right to a jury which is representative of a fair cross-section guarantees only that the pool of potential jurors from which individual juries are chosen represents a fair cross-section, and it would be "unworkable and unsound" to require each individual jury to mirror the whole community. *Id.* at —— – ——, 106 S.Ct. at 1764, 90 L.Ed.2d at 147–48. Further, the Court held that jurors who would under no circumstance impose the death penalty do not constitute a "distinctive group" within the community for purposes of a fair cross-section analysis. *Id.* at ——, 106 S.Ct. at 1764–65, 90 L.Ed.2d at 148. The Court commented that, unlike the systematic exclusion of women or minorities, the exclusion of jurors who will not obey the law serves the valid state interest of finding a single jury to apply the law impartially to the facts at both the guilt and penalty phases. *Id.* at ——, 106 S.Ct. at 1766, 90 L.Ed. at 149. The Court also commented that, unlike traditionally excluded groups, jurors who refuse to ever impose the death penalty are excluded by their own choice and may serve in noncapital cases. *Id.* at —— – ——, 106 S.Ct. at 1766–67, 90 L.Ed.2d at 149–50.

*Jury Representativeness*

■ Defendant made a motion before trial to quash the jury venire, alleging that

---

**2.** Defendant's challenge to death-qualified juries is based only upon federal constitutional grounds.

the jury selection system employed by the county produced a jury that was not representative of a fair cross-section of the community because Hispanics were systematically excluded from the jury venire. *See Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) (sixth amendment guarantees the right to a jury drawn from a fair cross-section). Defendant predicates his attack on the venire selection system only on a federal constitutional analysis.[3] Defendant's motion was denied. The State argues that the materials presented to the trial court in support of defendant's motion were undocumented and that the trial judge was justified in summarily rejecting the motion.

This Court treated this issue in *State v. Tillman,* No. 19000, slip op. at 42–49 (Utah Dec. 22, 1987), and found it without merit. As in *Tillman,* defendant did not request a hearing on the matter[4] and cannot do so now. *Id.* at 42. *See also* Utah Code Ann. § 77–35–18(c)(1)(ii) (1982). The statistics defendant offered to support his challenge are identical to those addressed in *Tillman.* Therefore, in accordance with our decision in *Tillman,* we find defendant's challenge on this issue unpersuasive.

Defendant's convictions are affirmed.

HALL, C.J., and HOWE and ZIMMERMAN, JJ., concur.

STEWART, Associate C.J., concurs in the result.

---

**3.** Defendant cites to article I, section 12 of the Utah Constitution, but argues case law and offers analysis based only on the federal constitution. Defendant did not challenge the jury venire under Utah Code Ann. § 78–46–16, which provides a method through which a defendant can claim that the statutory procedures outlining the methods of jury selection were not followed. Further, defendant cannot predicate his constitutional challenge on the statute. In *State v. Tillman,* No. 19000, slip op. at 42 n. 115 (Utah Dec. 22, 1987), this Court held that "constitutional challenges to panels should be brought

outside the framework of the [Jury Selection and Service] Act [Utah Code Ann. §§ 78–46–1 to –23 (1987)]."

**4.** Defendant argues that pursuant to Utah Code Ann. § 78–46–16, he was not required to request a hearing, but was entitled to one. However, as previously noted, defendant did not utilize section 78–46–16 for his challenge and therefore cannot claim he was entitled to the procedures outlined by the section.