STATE of Utah, Plaintiff and Appellee,

v.

Lance Conway WOOD, Defendant and Appellant.

No. 900194.

Supreme Court of Utah.

Dec. 30, 1993.

---

**74**

R. Paul Van Dam, Atty. Gen., J. Frederic Voros, Jr., Asst. Atty. Gen., Salt Lake City, for the State.

G. Fred Metos, Salt Lake City, for Lance Conway Wood.

STEWART, Justice:

A jury found defendant Lance Conway Wood guilty of murder in the first degree, a capital offense, aggravated sexual assault, a first degree felony, and aggravated kidnapping, a first degree felony. Wood received a life sentence for the murder conviction and two consecutive sentences of ten years to life for the aggravated sexual assault and aggravated kidnapping convictions. He appeals his convictions for murder and aggravated sexual assault.

On October 25, 1988, Wood, newly released from the Utah State Prison, moved into the Cedar City two-bedroom apartment of his girlfriend, Brenda Stapely, and her roommate, Paula Jones. Soon after, Michael Archuleta, also just released from prison, moved into the same apartment to be with his girlfriend, Paula Jones. Wood and Archuleta had known each other in prison.

On November 21, 1988, Wood and Archuleta purchased soft drinks at a local convenience store. After adding whiskey to their drinks, the two men engaged in a conversation with Gordon Church, who was seated in his car in a nearby parking lot. Church drove Wood and Archuleta up and down Main Street and then up Cedar Canyon. After returning to Cedar City, Church left Wood and Archuleta at their apartment complex.

Wood and Archuleta walked to the apartment of Anthony Sich, who lived above the apartment rented to Stapely and Jones. Wood told Sich that he was going into the mountains and asked if he could borrow a pair of gloves. Sich sent Wood to retrieve the gloves from his car, and while Wood was outside, Church returned and invited him and Archuleta to go for another drive.

Church drove Wood and Archuleta back to Cedar Canyon and pulled off the road. Wood and Archuleta exited the car first and

began to walk down a path. Archuleta told Wood that he wanted to rob Church, and Wood acquiesced. Church overtook the two men, and the three continued walking up the trail. As the men started back down the trail toward the car, Archuleta grabbed Church and put a knife to his neck. Although Wood attempted to stop Archuleta by grabbing his arm, Archuleta made a surface cut on Church's neck. Church broke free and ran, but Archuleta chased after and tackled him, again putting the knife to his neck and threatening to kill him. Archuleta cut Church's throat again so that the two cuts formed an "X" on the front of Church's neck.

Archuleta bent Church forward over the hood of the car and, with the knife still at Church's throat, had anal intercourse with him. At Church's request, Archuleta used a condom. Archuleta then turned to Wood, who was standing by the trunk of the car, and asked if he "wanted any." Wood declined. Archuleta went to the trunk of the car and opened it. He told Wood that he was looking for something with which he could bind Church. Wood removed a spare tire and a fan from the trunk, while Archuleta retrieved tire chains and battery cables. Wood remained at the rear of the car, while Archuleta returned to the front, where he wrapped the tire chains around Church. Archuleta also fastened the battery cable clamps to Church's genitals. Wood maintained before and at trial that he removed the clamps from Church as soon as he realized what Archuleta had done.

Archuleta led Church to the rear of the car and forced him into the trunk. Wood and Archuleta replaced the spare tire and fan and drove to a truck stop near Cedar City where they purchased gas. They continued north on Interstate 15 until they reached the Dog Valley exit. They parked along a deserted dirt road where Archuleta told Wood, "You know we have to kill him."

Archuleta removed Church from the trunk and attempted to kill him by breaking his neck. When that failed, Church suffered several blows to the head with a tire iron and a jack. The tire iron was then shoved and kicked so far into Church's rectum that it pierced his liver. A state medical examiner testified that Church was killed by injuries to the head and skull due to a blunt force and internal injuries caused by the tire iron inserted into Church's rectum.

Wood told police that he waited inside the car while Archuleta killed Church. Evidence adduced at trial, however, showed that Wood's pants and jacket were splattered with blood in a cast-off pattern indicating that during the beating, Wood was within two or three feet of Church, and that Wood was facing Church when the blows were struck. A blood spot appeared on the back of Archuleta's jacket, and Wood's shoes bore a transfer or contact blood stain caused by contact with a bloody object. Investigators found strands of human hair consistent with Church's hair wrapped around Wood's shoelaces. The injuries to Church's lower jaw were consistent with being kicked by someone wearing Wood's shoes. Three paired lesions on Church's back were caused by a dull-tipped instrument such as some red-handled side cutters found in the pocket of Wood's jeans.

After Church died, Wood and Archuleta dragged his body to some nearby trees, where they covered it with branches. They swept their path with branches on the way back to the car to conceal any footprints. With Wood at the wheel, the pair again drove north on I–15. They abandoned Church's car in Salt Lake City.

Wood called his friend Christy Worsfold and asked if he and Archuleta could come to her apartment for a few minutes. When the men arrived at the apartment, Worsfold immediately noticed that Archuleta's pants were caked with blood. Wood explained that they had been rabbit hunting the night before, their car had broken down, and they had hitchhiked to Salt Lake. The two men then went to a thrift store, where Archuleta bought some clean pants and repeated the rabbit hunting story to the store clerk.

Archuleta discarded his bloody jeans in a drainage ditch near the 45th South on-ramp to I–15 in Salt Lake County. He and Wood then went into a nearby Denny's restaurant, where Wood left the gloves he had borrowed from Sich. After eating, the two hitchhiked

as far as the Draper exit, where Archuleta pulled out Church's wallet, scattered its contents, and handed the wallet to Wood. They next hitchhiked to Salem, where they visited Archuleta's father. From there, they hitchhiked to Cedar City, arriving at about 11:30 p.m.

Wood immediately went upstairs to Sich's apartment and told him about the murder. When Sich advised him to contact the police, Wood responded, "[M]aybe I could get some kind of federal protection." Sich and Wood walked to a local convenience store, where Wood called Brenda Stapely, who was in Phoenix, and told her that Archuleta had killed someone. Stapely contacted John Graff, Wood's parole officer, and told him to call Wood at the store. Graff called Wood and arranged to meet him at the convenience store. Just before Graff's arrival with the police, Wood discarded Church's wallet.

Wood and Sich accompanied Graff and a police officer to the corrections department office, where Wood recounted the events of the previous night. The police arrested Archuleta for the murder and, after several interviews with Wood, also charged Wood with murder in the first degree, aggravated sexual assault, object rape, forcible sexual abuse, aggravated kidnapping, aggravated assault, and possession of a stolen vehicle.

The State stipulated to defendant's motion to sever the counts of object rape, forcible sexual abuse, aggravated assault, and possession of a stolen vehicle. Wood was tried by a jury for first degree murder, aggravated sexual assault, and aggravated kidnapping. The jury found him guilty on all three counts. Because the jury could not reach a unanimous verdict as to the death penalty, the court imposed a life sentence for first degree murder and two consecutive mandatory minimum sentences of ten years to life for aggravated sexual assault and aggravated kidnapping.

Wood's appeal from his convictions for murder in the first degree and aggravated sexual assault asserts that the trial court erred (1) in refusing to exclude two potential

jurors for cause, (2) in denying defendant's motion to suppress statements he made after he requested counsel, and (3) in imposing sentences for aggravated sexual assault and aggravated kidnapping because they were lesser included offenses of first degree murder. Wood also asserts that the evidence presented at trial was insufficient to support a conviction of first degree murder and aggravated sexual assault.

## I. POTENTIAL JURORS CHALLENGED FOR CAUSE

Wood contends that the trial court committed prejudicial error by refusing to excuse for cause two potential jurors who expressed a belief in the religious doctrine of "blood atonement"[1] on voir dire. Wood exercised two of his peremptory challenges to remove the jurors and used all his peremptory challenges during the course of jury selection.

In Utah, it is prejudicial error if a defendant uses all of his peremptory challenges and one of them was used to remove a juror who should have been removed for cause. *State v. Wetzel,* 868 P.2d 64, 66–67 (Utah 1993); *State v. Chealey,* 116 P.2d 377, 379 (Utah 1941); *see State v. Bishop,* 753 P.2d 439, 451 (Utah 1988); *State v. Gotschall,* 782 P.2d 459, 461 (Utah 1989); *State v. Brooks,* 563 P.2d 799, 802 (Utah 1977); *Crawford v. Manning,* 542 P.2d 1091, 1093 (Utah 1975). However, we will reverse the denial of a motion to remove a juror for cause only if the trial court abused its discretion in overruling the challenge for cause. *Gotschall,* 782 P.2d at 462; *Bishop,* 753 P.2d at 451; *State v. Cobb,* 774 P.2d 1123, 1125 (Utah 1989).

Each prospective juror in this case completed a thirty-two-page written questionnaire which asked if the juror was familiar with the term "blood atonement" and, if so, what that term meant to the juror. The questionnaire then asked if the juror believed in blood atonement as he or she had described it and would act in accord with that belief in deciding this case. The questionnaire also asked if the juror believed that all

---

1. "Blood atonement" is a belief held by some members of the Church of Jesus Christ of Latter-day Saints (L.D.S. Church) that a person can

obtain forgiveness for the shedding of another's blood only by shedding his or her own blood. This belief has several different variations.

persons convicted of murder in the first degree should receive the death penalty.

Prospective jurors Blaine Perkins and Raymond Homer both stated on the questionnaire that they were familiar with the term blood atonement and held a belief concerning it. Homer also indicated on the questionnaire that all persons convicted of first degree murder should receive the death penalty. However, after examination by the trial judge and the prosecuting and defense attorneys, Perkins and Homer both stated that their beliefs regarding blood atonement would not preclude them from imposing a life sentence and that they could do so if the State did not prove beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances.

Wood moved to strike these jurors on the ground that they gave equivocal answers with respect to their ability to impose a life sentence on a conviction for first degree murder. Wood now argues that Perkins' and Homer's beliefs on blood atonement were strongly held religious beliefs that would have biased their ability to impose a life sentence.

■ In *State v. Norton*, 675 P.2d 577, 589 (Utah 1983), *cert. denied*, 466 U.S. 942, 104 S.Ct. 1923, 80 L.Ed.2d 470 (1984), *overruled on other grounds by State v. Hansen*, 734 P.2d 421, 427 (Utah 1986), we held that prospective jurors whose beliefs would require them to impose the death penalty on all persons convicted of murder must be excused for cause. The key issue for the trial judge to determine is whether the juror "can hear the evidence and apply the law without legal partiality for or against capital punishment." *Id.* The test for determining legal partiality is

> whether a juror's views about capital punishment would prevent or substantially impair him or her from conscientiously taking the juror's oath and performing his or her duties as a juror by following the court's instructions on the law of capital punishment and applying them to the facts of the particular case.

*Id.* A generalized approval of, or opposition to, the death penalty alone does not constitute improper partiality. *Id.* We note, and emphasize, that the test is whether the juror's views would either prevent *or impair* the performance of his or her duties as a juror in applying the law and deciding the facts. In other words, if there is reason to believe that a juror's personal views might affect his or her judgment in applying the law, deciding the facts, or imposing a penalty, then the juror should be excused.

■ There is a tendency to assume that a prospective juror is qualified to sit if the juror states that he or she will apply the law objectively in deciding the appropriate penalty in a capital case. It is a serious oversimplification to conclude that a prospective juror is qualified to sit simply because the juror states that he or she can weigh the mitigating and aggravating circumstances and arrive at a proper result, notwithstanding strongly held views or beliefs pertaining to the death penalty. As we made clear in *State v. Holland*, 777 P.2d 1019, 1026–27 (Utah 1989), weighing mitigating and aggravating circumstances is only part of the analysis that a juror must make. It is not enough for a juror to state that he or she will weigh those factors in deciding the death penalty issue under the test laid down in *State v. Wood*, 648 P.2d 71, 83 (Utah 1982). The weighing of aggravating and mitigating circumstances is not a mathematical exercise by which a juror objectively counts up the aggravating and mitigating circumstances to determine which is greater. There are no clear and specific instructions stating any objective formula that specifies the weight to be given to each factor and how it should be weighed against other factors. In fact, the jury has broad discretion in deciding the ultimate issue. Thus, subjective attitudes necessarily play a role in determining how much "weight" each factor should be accorded and which factors should predominate. In addition, in applying the second part of the *Wood* standard, that is, to determine beyond a reasonable doubt that the death penalty is justified under all the circumstances, including, but not limited to, the aggravating and mitigating circumstances, jurors must again weigh a multitude of factors which are disparate in nature and imprecise in weight and relevance to the ultimate question, again

leaving room for subjective attitudes to affect the decision. *Id.* at 83–85. Thus, the second part of the *Wood* standard is even less precise than the first and necessarily calls into question jurors' basic attitudes about murder and the proper role of the criminal justice system. *Id.* at 83–84; *State v. Holland,* 777 P.2d 1019, 1027–28 (Utah 1989).

■ A trial judge must recognize that the legal requirements for deciding between life and death do not give a juror the same kind of clear, specific guidelines that they receive in deciding the guilt phase. It follows that the subjective attitudes of even the most conscientious jurors must be given the closest scrutiny with respect to those attitudes that could affect their impartiality in the penalty phase. It is imperative, therefore, that a trial judge be especially alert to excuse prospective jurors whose personal views, notwithstanding a stated willingness to apply the law as given them, are such that they are likely to tilt in favor of their personal biases.

The transcript of juror Perkins' voir dire does not support Wood's contention that Perkins' views on blood atonement would cause him to act in accordance with a personal bias in that part of the penalty phase that requires the exercise of some discretion. Defense counsel asked Perkins:

Q. What in general are your feelings and beliefs on the death penalty?

A. Well I believe that if a person is found guilty without any doubt of a crime of that nature that the death penalty could be.

Q. You are not philosophically opposed to that?

A. No.

Q. You are not philosophically in favor it?

A. No.

Q. Have you ever debated it with a friend or a colleague or family member discussed its moral implications?

A. Well I probably have entered into some discussions I guess on a religious more or less.

Q. You are active L.D.S.?

A. Yes I am.

Q. And of course you adhere to the doctrines and policies of the church?

A. Yes.

Q. Do you think that the church has a position on the death penalty?

A. The church as a whole?

Q. Yes.

A. Well only on the blood atonement I think and that comes down to individual's choice. It doesn't leave it up to me. It is up to the individual who is involved in it.

Q. Your understanding of that is then that if a person has committed a crime of serious murder or as serious as murder [then] that person as a part of a Blood Atoning process could give his own life?

A. Yes.

Q. Does that state your understanding of that principle?

A. That is the way I understand it from their own choice not from mine but from theirs.

Q. But as you understand that concept [if] a person did that then forgiveness would result?

A. By Blood Atonement.

Q. You believe that?

A. Yes I do.

Q. Do you believe that is church doctrine?

A. I think it is, yes, from my understanding.

The prosecution then asked Perkins:

Q. Would you, if selected as a juror, be able to be guided by the instructions given by the court and assess the evidence presented without regard to your personal belief having to do with atonement for murder?

A. Yes.

Q. And you could be impartial in the sense that your belief would not influence your ability to follow the law and make findings of fact from the evidence?

A. Yes.

■ The last two questions asked by the prosecutor and the almost predictable an-

swers thereto add little in determining the juror's qualifications. Nevertheless, Perkins was not disqualified to sit on the jury because his belief in blood atonement had no relevance to the discharge of his duty as a juror. In fact, Perkins' understanding of blood atonement was that atoning for a murder with one's own blood was a matter of personal choice to be made by a guilty person, not by a jury. He also stated that he was neither philosophically opposed to, nor in favor of, the death penalty and that his belief regarding blood atonement would not influence his ability to apply the law. There was nothing equivocal in Perkins' answers that suggested that his belief would prevent him from acting impartially as a juror. The trial court did not abuse its discretion in refusing to excuse Perkins for cause.

Juror Homer's voir dire raises a closer question as to whether he should have been disqualified. He was interrogated in the following manner:

Q. [The Court] My question to you at this time then is where that kind of instruction which I would give to you in more detail at the beginning of the trial and at the end of the trial again could you follow that instruction as to what the law is and have this choice of sentencing, could you do that?

A. Yes I believe so.

Q. And would you be very uncomfortable if you thought that the aggravating circumstances exceeded the mitigating to the point of where death would be ... appropriate would you be able to vote for the death penalty?

A. Yes.

Q. And if you felt like the mitigating circumstances [were] sufficient to override the aggravating circumstances could you vote for life imprisonment?

A. Yes.

. . . .

Q. [Defense Counsel] Let me have you open your questionnaire Mr. Homer to page 6 and let's look at three questions on that page. Question 50, 51 and 52, those questions talk about Blood Atonement. You have answered No. 50 say-

ing that you are familiar with that term and you have defined that as you are familiar with it in No. 51 by saying if you spill another's blood your blood must be spilled.

Then in Question No. 52 you state that you would apply the term as you believe it in this case what do you mean when you say that?

A. Just that the principle of Blood Atonement is that if a person takes another person's life then his life should be taken. If the case came to prove the validity of the contention that the defendant was guilty then he would indicate there that the possibility that his life should be taken.

Q. The court has discussed with you what happens under Utah Law if a person is found guilty of a capital crime?

A. Yes.

Q. It doesn't necessarily result in the death penalty if there is a finding of guilt which there may not be but if there is then two options exist one for life and one for death.

A. I say that is my understanding of Blood Atonement. I don't say that is my hard opinion of how it ought to be carried out in every case.

Q. Okay could you purge your mind of any idea of Blood Atonement and follow the law in the case.

A. Yes.

Q. If you were selected as a member of the jury?

A. Yes.

Q. Because Blood Atonement has nothing to do with this case?

A. Yes.

. . . .

Q. [Defense Counsel] Look down on Page 28 if you would Mr. Homer at Question 236 and the question is do you believe that all persons convicted of Murder in the First Degree, a capital offense, should receive the death penalty and you answered, "yes".

A. Yes.

Q. After hearing Judge Park's advice concerning the law would you see the need to change your answer on that question?

A. Yes if the mitigating circumstances warranted.

Q. Could you feel comfortable in voting for life versus death if the aggravating factors did not outweigh the mitigating factors?

A. No I don't believe so.

Q. I am not sure you understood my question, let me give it to you again?

A. Well do I understand aggravating and mitigating?

Q. Aggravating means those matters that would be against Mr. Wood the unfavorable things[.]

A. Yes.

Q. Mitigating circumstances means the favorable things.

A. Not necessarily then what the victim may have done to aggravate Mr. Wood and make him angry or—

Q. No it is not aggravation is not used in that sense no.

A. Yes. Mitigating circumstances would be then what [is] in his background that he had no control of but has made conclusion or decisions based upon that back experience that brought him to the point where he is at.

Q. *Yes mitigating means more than just that and it means any matters that would be favorable to Mr. Wood his youth, his background, his actual participation or lack of participation, his state of mind, duress and pressure on him and his ability to be rehabilitated to become a productive citizen all of those things come into play on the mitigating side. On the aggravating side ... anything that is cruel, a torture, a senseless, premeditation all of those matters would come in on the aggravating side and so you have to balance them and weigh them.*

A. *Yes.*

Q. And my question to you is if the State of Utah did not prove beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances could you in all, could you comfortably vote for life sentence and not the death penalty?

A. Oh yes.

Q. Even though he is convicted of the murder?

A. Yes I believe so.

Q. Then looking at that question 236 what do you feel should be the appropriate answer to that?

A. Well it would be "no" then.

Q. Do you have reservations about that?

A. Quite not so definitely there that all persons convicted of Murder should receive the death penalty. So that is a pretty strong statement there. With that explanation of aggravating and mitigating circumstances I believe I could comfortabl[y] change that to a "no".

(Emphasis added.)

■ Although Homer stated a belief in the doctrine of blood atonement, he then explained that his belief was not a "hard opinion of how it ought to be carried out in every case" and that he would take into account defendant's background, actual participation or lack of participation, his state of mind, any duress or pressure on him, and his ability to be rehabilitated. Furthermore, although Homer wrote on the questionnaire that he believed the death penalty should be applied in all capital homicide cases, he stated that he was comfortable in changing his answer to that question after an explanation of the law was given him. Although the trial judge was at the very limit of his discretion, we cannot say that he abused it in refusing to remove Homer for cause.

## II. MOTION TO SUPPRESS

Wood's parole officer, John Graff, interviewed Wood for approximately an hour and fifteen minutes at the correctional facility after meeting him at the convenience store. Wood told Graff and other police officers who were present that he had witnessed a murder the night before. Graff did not advise Wood of his *Miranda* rights prior to this interview. Iron County Attorney Scott Burns arrived at

the end of Graff's interview. At Graff's suggestion, Burns informed Wood of his *Miranda* rights before taking a statement. Wood waived his rights and gave a statement to Burns. Wood then accompanied Burns, Graff, and the Iron County Sheriff to the scene of the homicide at Dog Valley. When the officers realized that the crime site was in Millard County, they and Wood met Millard County officials for breakfast at a Millard County cafe. Wood repeated his version of the crime and led the police to the homicide site, where he directed the officers to the body.

While at the homicide scene, Wood was permitted to roam freely. At one point, he was left unrestrained and alone in a patrol car with the motor running. The police did not indicate at that time that they suspected Wood of the murder, and the trial court specifically found that at this point in the investigation the police considered Wood only a witness. Captain Robert Dekker drove Wood from the homicide scene to a place under a freeway overpass. When Dekker gave Wood a *Miranda* warning, Wood wondered aloud whether he should consult an attorney regarding protective custody. Dekker asked whether Wood's reference to an attorney was "for questioning purposes right now." Wood replied, "No," and said that he wanted to talk with Dekker. Wood then gave another statement to Dekker.

Wood voluntarily spoke with Millard County Detective Charles Stewart on November 23, 1988. Stewart began the interview with a recitation of the *Miranda* warnings. Wood waived his rights and gave a statement. On November 25, 1988, Stewart interviewed Wood again. After a few minutes, Wood terminated the interview with a request for counsel. That same day, Wood appeared before a magistrate and was formally charged with the murder and ordered to be held without bail. After being advised of his right to an attorney, Wood asked the magistrate for additional time to obtain counsel of his own choosing.

The following day, Wood called Deputy Whatcott to his cell and asked if they could talk. Whatcott replied that he was busy and could not talk then but would come back as soon as he could. When Whatcott returned, he gave Wood a *Miranda* warning and asked Wood whether he understood his rights. Wood responded, "Yea, I understand. I've heard them a thousand times." Wood then asked what was going on with his case. Whatcott responded that they were probably going for capital homicide and that Wood was looking at the death penalty. Wood told Whatcott to get a tape recorder because he wanted to talk. Whatcott called in Stewart, who gave Wood another *Miranda* warning. Wood waived his right to counsel and gave a statement.

Wood moved to suppress all statements he made to law enforcement officials. The trial court denied the motion. Wood appeals that denial only with respect to the Dekker interview and the third Stewart interview.

## A. Dekker Interview

 The Fifth Amendment to the United States Constitution guarantees that a defendant shall not be "compelled in any criminal case to be a witness against himself." To secure this fundamental right, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), established procedural safeguards to be followed in a custodial interrogation. The prescribed procedures require a warning that the defendant has the right to remain silent and the right to have an attorney present during questioning. *Id.* at 444, 86 S.Ct. at 1612. The defendant may waive these rights, but the waiver must be voluntary, knowing, and intelligent. *Id.* If the defendant "states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.* at 474, 86 S.Ct. at 1627; *accord Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); *Arizona v. Roberson*, 486 U.S. 675, 682, 108 S.Ct. 2093, ——, 100 L.Ed.2d 704 (1988). The prosecution may not use as evidence a defendant's statements obtained in violation of these safeguards. *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612.

The trial court ruled that Wood was not in custody at the time of the Dekker interview and consequently *Miranda* did not apply. The trial court also found that even if the Dekker interview were custodial, Wood's ref-

erence to an attorney was motivated by a desire to obtain protection from Archuleta rather than a request to have counsel present during questioning. Wood argues that the trial court erred in concluding that he was not in custody at the time of the interview and that his statement regarding an attorney amounted to a request for counsel, barring any further questioning. Wood can prevail on this issue only if he was in custody at the time of the interview and did not make a knowing, intelligent, and voluntary waiver of his right to counsel.

Four factors determine whether an accused who has not been formally arrested is "in custody" for *Miranda* purposes: "(1) the site of interrogation; (2) whether the investigation focused on the accused; (3) whether the objective indicia of arrest were present; and (4) the length and form of interrogation." *Salt Lake City v. Carner,* 664 P.2d 1168, 1171 (Utah 1983); *see State v. Bishop,* 753 P.2d 439, 465 (Utah 1988); *State v. Kelly,* 718 P.2d 385, 391 (Utah 1986). The absence of "coercive or compulsive strategy on the officer's part" evidences a noncustodial interrogation that "does not suggest the type of abuse *Miranda* is intended to prevent." *Kelly,* 718 P.2d at 391.

Subsequent to our decision in *Carner,* the United States Supreme Court issued two decisions holding that a custodial interrogation exists when a suspect is under formal arrest or has a reasonable belief that he or she is in police custody of a type associated with formal arrest. *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983); *Berkemer v. McCarty,* 468 U.S. 420, 441–42, 104 S.Ct. 3138, 3151–52, 82 L.Ed.2d 317 (1984). The State asks us to retreat from *Carner* and to adopt the standards set forth in *Beheler* and *Berkemer.* We first note that our decision in *Carner* was not based on an accused's privilege against self-incrimination as guaranteed by the Fifth Amendment to the United States Constitution. It was decided under Article I, section 12 of the Utah Constitution, which provides that an "accused shall not be compelled to give evidence against himself." Because *Carner* gives broader protection to a defendant's right against self-incrimination, we are not required to apply the test adopted by the United States Supreme Court in *Beheler* and *Berkemer.*[2]

The State criticizes *Carner's* four-part test as giving undue weight to the interrogation site as opposed to other more important factors, such as whether the defendant's freedom of movement has been restrained, whether the defendant has come to the site freely and willingly, or whether the defendant was free to leave after the interrogation. *Carner* does not ignore these factors or place undue emphasis on the site of the interrogation. The interrogation site is only one factor of four that, depending on the circumstances, may or may not be given substantial weight. The factors the State emphasizes as being more important are not precluded from consideration under *Carner,* but fall within two of the *Carner* factors: objective indicia of an arrest, and length and form of questioning.

*Carner* recognizes that even though a suspect may not be formally under arrest, he may still be "in custody" for practical purposes. In essence, *Carner* emphasizes the importance of individual circumstances in determining whether a person is "in custody" for *Miranda* purposes, rather than the formality of an arrest that can be manipulated to circumvent the procedural safeguards of *Miranda.* We decline to depart from *Carner.* The test established there determines whether one is "in custody" before a formal arrest is made.[3]

---

2. The *Beheler* and *Berkemer* decisions have created some confusion in the Utah Court of Appeals regarding the continuing precedential value of *Carner. See, e.g., State v. Mirquet,* 844 P.2d 995, 997–1000 (Utah Ct.App.1992); *id.* at 1001–04 (Bench, J., dissenting). We now make clear that in Utah the appropriate standard for determining whether an interrogation prior to an arrest is custodial is that set out in *Carner.*

3. The Utah Court of Appeals has added as a fifth factor, "whether the defendant came to the place of interrogation freely and willingly." *State v. Sampson,* 808 P.2d 1100, 1105 (Utah Ct.App. 1991). The defendant's willingness to come to the site of interrogation, however, falls within the objective indicia of arrest and therefore is not truly an additional factor.

The trial court applied the *Carner* factors generally to all the interviews between Wood and the police but did not specifically address how the factors applied to the Dekker interview. Because the underlying facts are not in dispute, we review the trial court's conclusion that Wood was not in custody during the Dekker interview for correctness. *See State v. Thurman*, 846 P.2d 1256, 1271 (Utah 1993); *see also State v. Sampson*, 808 P.2d 1100, 1103 (Utah Ct.App. 1991); *People v. Russo*, 148 Cal.App.3d 1172, 196 Cal.Rptr. 466, 468 (1983).

The site of the questioning was not intimidating or coercive, nor does it compel a finding that Wood was in custody. The interview took place in a police car under a freeway overpass, and although in many instances questioning in a patrol car may suggest a lack of freedom on the part of the defendant, the situs of the questioning in this case did not suggest either a de facto arrest or the presence of intimidation. Wood voluntarily led the police to the homicide scene. He roamed the homicide site freely and apparently entered the patrol car willingly. On the facts of this case, the site of interrogation does not suggest that Wood was in custody.

The second factor, whether the investigation focused on Wood, likewise does not suggest actual custody. The trial court found that up until that point, the investigation had not focused on Wood and that the police had viewed Wood as nothing more than a witness. We will not set aside a trial court's finding of fact unless clearly erroneous. *State v. Bruce*, 779 P.2d 646, 649 (Utah 1989); *State v. Hegelman*, 717 P.2d 1348, 1350 (Utah 1986). Testimony at the suppression hearing supports this finding. Several officers testified that they did not consider Wood to be a suspect at this time, but only a witness, and their testimony was consistent with the circumstances. Thus, the trial court's finding on this point was not clearly erroneous.

With respect to the third factor, the trial court found that there were no objective indicia of arrest. Wood was free to leave at any time; he was not handcuffed, threatened, or coerced. His movement was not restrained and, indeed, he seemed anxious to stay with the police out of fear of Archuleta.

Finally, with respect to the length and form of the interrogation, the trial court noted that although Wood had been questioned for several hours since the early hours of the morning, that was by Wood's own choosing. Viewing the totality of the circumstances, the trial court correctly concluded that Wood was not in custody at the time of the interview and that *Miranda* did not apply.

Even if we were to assume that the Dekker interview was custodial, our holding would be the same because the record clearly shows that Wood's reference to an attorney did not amount to an invocation of the right to counsel and that Wood made a voluntary, knowing, and intelligent waiver of that right.

As stated, *Miranda* provided that if a defendant "indicates *in any manner* ... that he wishes to consult with an attorney before speaking there can be no questioning." *Miranda*, 384 U.S. at 444–45, 86 S.Ct. at 1612 (emphasis added). In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court made clear that this was a prophylactic rule and that when a suspect requests counsel, all questioning must cease "until counsel has been made available to him, *unless the accused himself initiates further communication,* exchanges, or conversations with the police." *Id.* at 484–85, 101 S.Ct. at 1885 (emphasis added). The fact that the accused continues to talk after requesting counsel is not by itself a valid waiver of the right to have counsel present. *Id.*

*Edwards* dealt with a clear, unequivocal request for counsel and did not address what was required of law enforcement officials if a defendant made an ambiguous request for counsel, as Wood did. Although Wood talked about consulting an attorney, his comment about protective custody made it unclear whether he was requesting that an attorney be present while he talked with the authorities or whether he merely wanted legal assistance in obtaining protection from Archuleta.

When a request for counsel is ambiguous or equivocal, courts have taken three differ-

ent approaches. *Smith v. Illinois,* 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), stated:

> Some courts have held that all questioning must cease upon any request for or reference to counsel, however equivocal or ambiguous. Others have attempted to define a threshold standard of clarity for such requests, and have held that requests falling below this threshold do not trigger the right to counsel. Still others have adopted a third approach, holding that when an accused makes an equivocal statement that "arguably" can be construed as a request for counsel, all interrogation must immediately cease except for narrow questions designed to "clarify" the earlier statement and the accused's desires respecting counsel.

*Id.* at 96 n. 3, 105 S.Ct. at 493 n. 3 (citations omitted). The Court did not, however, decide what effect an ambiguous or equivocal request for counsel had, nor did it determine which, if any, of the tests was preferable. *Id.* at 99–100, 105 S.Ct. at 494–495.

We do not believe that an ambiguous or equivocal request for counsel requires that all further communication end. A simple, straightforward effort to clarify the request is appropriate. A request for clarification may not, however, be an attempt at persuasion to forego an attorney. When an ambiguous request is accompanied by a voluntary, expressed willingness to talk, that should not preclude all further conversation between the suspect and the interrogating officer. *Thompson v. Wainwright,* 601 F.2d 768, 771 (5th Cir.1979); *Nash v. Estelle,* 597 F.2d 513, 517 (5th Cir.1979) (en banc).

The Court of Appeals for the Fifth Circuit addressed the effect of an equivocal, ambiguous request for counsel in *Nash v. Estelle,* 597 F.2d 513 (5th Cir.1979) (en banc). The defendant, after being informed of his rights, asked if he had to request counsel in writing. When the prosecutor told him that he could do so orally, the defendant asked that counsel be appointed. The prosecutor replied, "Okay. I had hoped that we might talk about this, but if you want a lawyer appointed, then we are going to have to stop right now." When the defendant protested mildly

that he wanted to talk, the prosecutor verified that the defendant was willing to talk without counsel and asked him to sign a waiver. The court sustained the admission of the statements taken. *Id.* at 520. The court stated, and we agree, that the word "lawyer" was not "endowed with talismanic qualities" such that a prosecutor could not ascertain whether a defendant's ambiguous statements with respect to counsel were an invocation of the right to have counsel present during questioning. *Id.* at 519–20.

The Fifth Circuit reiterated this position in *Thompson v. Wainwright,* 601 F.2d 768, 771 (5th Cir.1979). When a suspect makes an equivocal request for an attorney,

> the scope of that interrogation is immediately narrowed to one subject and one only. *Further questioning thereafter must be limited to clarifying that request* until it *is* clarified. When and if it is clarified as a present desire for the assistance of legal counsel, *all* interrogation must cease until that is provided, just as in the case of an initial, unambiguous request for an attorney.

*Id.* at 771 (emphasis in original). The court stressed, however, that

> the limited inquiry permissible after an equivocal request for legal counsel may not take the form of an argument between the interrogators and suspect about whether having counsel would be in the suspect's best interests or not.... Such measures are foreign to the purpose of clarification, which is not to persuade but to discern.

*Id.* at 772. *Thompson* suppressed the defendant's statements because after the defendant made an equivocal request for counsel, the interrogating officer did not limit his inquiry to clarifying the request but advised the defendant that consulting with an attorney would not be in his best interests. *Id.*

The rule laid down in *Thompson* provides a practical and sensible solution to the problem. It not only safeguards a suspect's right to have counsel present during an interrogation when he wants and requests it, but it also allows a suspect to answer questions, should he choose to do so.

■ We hold that when a defendant makes an ambiguous or equivocal request for an attorney, questioning with respect to the subject matter of the investigation must immediately stop, and any further questioning must be limited to clarifying the request. If the defendant then makes clear that he or she desires to have counsel present, further questioning is prohibited. *See also State v. Sampson*, 808 P.2d 1100, 1109 (Utah Ct.App. 1991); *State v. Griffin*, 754 P.2d 965, 969 (Utah Ct.App.1988).

■ In the instant case, Officer Dekker complied with this rule. When Wood mentioned consulting an attorney for purposes of protective custody, Dekker asked what he meant. Wood said that he was concerned about his safety and wondered if he ought to talk to an attorney about protective custody or the federal witness protection program. Dekker asked Wood whether he wished to consult with an attorney for questioning purposes right then, and Wood replied, "No" and expressed a willingness to talk to Dekker. Dekker then turned on a tape recorder, repeated Wood's *Miranda* rights, and asked, "You have made a reference to an attorney but that isn't for questioning purposes right now?" Wood again replied, "No."

These facts support the trial court's finding that Wood did not invoke his right to have counsel present during questioning but was only concerned with obtaining protection from Archuleta. Furthermore, when asked for a clarification, Wood expressed a willingness to talk with Dekker. Wood had been informed of his rights prior to the interview and stated that he understood them. Under these circumstances, the trial court did not err in concluding that Wood made a voluntary, knowing, and intelligent waiver of his rights.

*B. Third Stewart Interview*

Wood challenges the admission of the statements he made to Stewart in the third interview, again on the ground that he did not make a voluntary, knowing, and intelligent waiver of his right to have counsel present.

The right to have counsel present at a post-arraignment custodial interrogation stems from both the Fifth Amendment right against compelled self-incrimination and the Sixth Amendment guarantee of the assistance of counsel. *Michigan v. Jackson*, 475 U.S. 625, 629, 106 S.Ct. 1404, 1407, 89 L.Ed.2d 631 (1986). Because Wood does not specify the source of his right to counsel at the third Stewart interview, we will determine whether he waived his right to counsel under both amendments.

■ Wood clearly invoked his Fifth Amendment right to counsel during the second Stewart interview. As required by *Miranda* and *Edwards*, the police immediately terminated the interview and did not attempt any further communications with Wood. *Miranda v. Arizona*, 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694 (1966); *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); *State v. Moore*, 697 P.2d 233, 236 (Utah 1985). Under *Edwards*, once a defendant has invoked the right to counsel, subsequent statements may not be admitted against him unless (1) the defendant initiates the conversation in which the incriminating statements are made, (2) the prosecution shows that a knowing and intelligent waiver of the right to counsel has been made, and (3) the statements were voluntarily made. *Edwards*, 451 U.S. at 484–85, 101 S.Ct. at 1884–85; *Moore*, 697 P.2d at 236.

■ For a defendant to initiate a conversation with the authorities within the holding in *Edwards*, the defendant must do more than engage in "a generalized conversation about something unrelated to the crime charged," such as request a drink of water or discuss the weather. *Moore*, 697 P.2d at 236. The defendant must indicate a desire " 'to open up a more generalized discussion relating directly or indirectly to the investigation.' " *Id.* (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983) (plurality opinion)).

In the instant case, Wood initiated contact with the police. He called Deputy Whatcott over to his cell. Before Wood could speak, Whatcott reminded Wood of his right to have an attorney present. Wood then asked what

was going on with his case. Wood's question evidenced a desire on his part to discuss the investigation and the status of his case. Whatcott simply answered the question; he did not ask any questions or ask Wood to make any statements. Wood then told Whatcott that he wanted to talk. Based on these facts, we conclude that Wood initiated the conversation that resulted in his statements in the third Stewart interview.

Whether a waiver of the right to counsel was made knowingly and intelligently depends "upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Oregon v. Bradshaw*, 462 U.S. 1039, 1046, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983) (plurality opinion). When a defendant gives statements after invoking the right to an attorney, the State "bears a heavy burden to establish not only that defendant understood his constitutional rights, but that he voluntarily elected to waive them." *State v. Velarde*, 734 P.2d 440, 443 (Utah 1986).

Before giving his statements to Stewart, Wood was read his *Miranda* rights twice: once before Whatcott would even speak to him and again before Stewart began to ask questions. Wood told Whatcott that he understood his rights and that he had heard them "a thousand times," indicating that he was well aware that he had the right to counsel. In fact, Wood terminated the interview the day before with a request for counsel. Wood had also been advised of his right to counsel at the arraignment held before the third interview and indicated to the magistrate that he intended to retain counsel. All the evidence points toward the fact that Wood knew he had the right to counsel and that he knowingly waived that right.

Once a defendant invokes the right to counsel, the State cannot use threats, promises, or trickery to coerce or entice him or her to talk. *Haynes v. Washington*, 373 U.S. 503, 513–14, 83 S.Ct. 1336, 1342–44, 10 L.Ed.2d 513 (1963); *Brown v. Mississippi*, 297 U.S. 278, 285–87, 56 S.Ct. 461, 464–66, 80 L.Ed. 682 (1936); *State v. Moore*, 697 P.2d 233, 236 (Utah 1985) (citing *State v. Watts*, 639 P.2d 158, 160 (Utah 1981)). However, nothing in the record indicates that the police made any promises or threats to Wood. In fact, the police made no attempt to talk with Wood after he invoked the right to counsel until he told them that he wanted to talk. Wood asserts that the police frightened him into talking by telling him that he was facing the death penalty. The trial court correctly found that that statement was nothing more than a truthful answer to Wood's question of what was going on with his case and that it was not made with the intent to trick Wood into talking.

Wood also argues that the officers' failure to obtain counsel for him for more than thirty hours after he invoked his right amounted to coercive measures that made his waiver involuntary. Wood, however, asked the magistrate for time to obtain his own attorney, thereby indicating that he was not relying on the police or the court to appoint counsel for him. The testimony was clear at the suppression hearing that Wood made no phone calls or any other attempts to find and retain an attorney during those thirty hours. We find no evidence in the record that supports a conclusion that Wood's waiver was not voluntary.

The Sixth Amendment right to counsel attaches at the initiation of adversary judicial criminal proceedings, "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972); *Michigan v. Jackson*, 475 U.S. 625, 629, 106 S.Ct. 1404, 1407, 89 L.Ed.2d 631 (1986). Because Wood had been formally charged and arraigned when the third Stewart interview took place, his Sixth Amendment right to counsel attached. Like the Fifth Amendment right to counsel, the Sixth Amendment right can be waived if it is voluntary, knowing, and intelligent. *See Jackson*, 475 U.S. at 630, 106 S.Ct. at 1408.

In *Michigan v. Jackson*, the Supreme Court held that the procedural safeguards that *Edwards* applied to the Fifth Amendment right to counsel applied equally to the Sixth Amendment right to counsel when the accused has " 'asked for the help of

a lawyer' in dealing with the police." *Patterson v. Illinois*, 487 U.S. 285, 291, 108 S.Ct. 2389, 2394, 101 L.Ed.2d 261 (1988) (quoting *Jackson*, 475 U.S. at 531, 106 S.Ct. at 1325). A waiver of the Sixth Amendment right to counsel is valid only when there has been " 'an intentional relinquishment or abandonment of a known right or privilege.' " *Id.* 487 U.S. at 292, 108 S.Ct. at 2395 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). *Patterson* stated that the key inquiry is, "Was the accused, who waived his Sixth Amendment rights during postindictment questioning, made sufficiently aware of his right to have counsel present during the questioning, and of the possible consequences of a decision to forego the aid of counsel?" *Id.* 487 U.S. at 292–93, 108 S.Ct. at 2395.

In *Patterson*, the Supreme Court held that a *Miranda* warning given early in the proceedings sufficiently apprised a defendant who had not yet requested counsel of his Sixth Amendment right to have counsel present during questioning and the possible consequences of a decision to forego the aid of counsel. *Id.* at 293, 108 S.Ct. at 2395. The Court reasoned that the warning informed the defendant of his right to counsel and that any statement that the defendant made would be used against him. *Id.*

■ The record clearly establishes that Wood knew of his right to counsel and intentionally relinquished it. During the days that Wood spoke to police, he was Mirandized at every turn. He made no statement concerning his involvement in the crime that was not preceded by *Miranda* warnings. After each warning, Wood stated that he understood he had the right to counsel, and at one point, he exercised that right. Wood initiated the conversations that led to the statements in question and was given *Miranda* warnings *twice* before he actually made the statements. There is nothing in the record to support a conclusion that Wood did not know of his right to counsel or that he did not intentionally relinquish that right. Nor is there any indication that Wood's waiver was not voluntary. He was not threatened, coerced, or promised anything in exchange for his statement; the statements were made on Wood's own initiative.

The trial court did not err in admitting Wood's statements into evidence.

## III. SUFFICIENCY OF EVIDENCE

Wood contends that the evidence adduced at trial was insufficient to establish that he committed first degree murder and aggravated sexual assault.

■ In reviewing the sufficiency of the evidence, we view the evidence and the inferences reasonably drawn therefrom in the light most favorable to the jury verdict and assume that the jury believed the evidence and inferences that support the verdict. *State v. Stewart*, 729 P.2d 610, 611 (Utah 1986); *State v. Kalisz*, 735 P.2d 60, 61 (Utah 1987) (per curiam). We will affirm the jury verdict as "long as there is some evidence, including reasonable inferences, from which findings of all the requisite elements of the crime can reasonably be made." *State v. Booker*, 709 P.2d 342, 345 (Utah 1985).

■ With respect to the first degree murder conviction, Wood argues that the evidence does not support the jury's finding that he caused Church's death or that he acted intentionally or knowingly. Wood concedes that the physical evidence indicates that he was present during at least part of the fatal beating, but argues that the only evidence suggesting that he struck the victim was the bloodstain on his shoe and the hair wrapped around his shoelace. He asserts that there was no evidence that he struck the fatal blow or that he intended that Church be killed.

■ One who encourages or aids another in committing a crime may be convicted of that crime even though he did not personally commit it. *State v. Johnson*, 745 P.2d 452, 455 (Utah 1987); *see Codianna v. Morris*, 660 P.2d 1101, 1108 (Utah 1983). Utah Code Ann. § 76–2–202 states, "Every person, acting with the mental state required for the commission of an offense who ... encourages, or intentionally aids another person to engage in conduct which constitutes an of-

fense shall be criminally liable as a party for such conduct."

While it may be true that the evidence does not support a finding that Wood personally killed Church, the evidence is sufficient to find that he aided and abetted Archuleta in the killing. The blood splatters on Wood's clothes support an inference that he was close by Church during the beating. The blood transfer stain on Wood's shoe, the hair consistent with Church's hair that was wrapped forcibly around Wood's shoelace, and the injury to Church's jaw consistent with being kicked by someone wearing Wood's shoes support the conclusion that Wood kicked Church while Archuleta was beating him to death. On Church's back were three paired lesions, two of which were puncture wounds accompanied by bruising. An inference exists that the wounds were inflicted by a pair of red-handled side cutters found in the pocket of Wood's jeans, and that inference suggests that Wood assisted Archuleta in inflicting wounds on Church.

Based on this evidence, the jury could reasonably conclude that Wood participated in and aided, to some degree, the beating and assault that ultimately led to Church's death. Wood asserts that even if he kicked Church, the blow was not life threatening. The blow did not have to be life threatening. It is enough that he kicked Church in the jaw and was otherwise cooperating with Archuleta while Archuleta was viciously beating Church with a tire iron and a jack in the fatal encounter. Clearly, the jury could find that what Wood did, he did knowingly and with the intent that Church be killed, even if Wood's role was secondary to that of Archuleta.

The evidence was also sufficient to support Wood's conviction of aggravated sexual assault. The charge of aggravated sexual assault was based on three possible factual grounds: (1) attaching the battery clamps to Church's genitals, (2) forcible anal intercourse, and (3) object rape with the tire iron. There was no evidence to support a conclusion either that Wood had anal intercourse with Church or that he attached the battery clamps to Church's genitals. Wood's testimony, as well as all prior statements to friends and the police, stated that it was Archuleta and not Wood who committed these acts. No other testimony or physical evidence pointed to a contrary conclusion. Without more, the fact that Wood was present during these crimes is not enough to convict him of being an accomplice to those crimes. *State v. Helm,* 563 P.2d 794, 797 (Utah 1977); *State v. Gee,* 28 Utah 2d 96, 498 P.2d 662, 665 (1972).

There was evidence, however, that Wood aided and abetted Archuleta in committing the object rape with the tire iron. Wood asserts that Archuleta shoved or kicked the tire iron into Church's rectum. Nevertheless, the jury could have concluded that Wood aided and abetted Archuleta in this act on the ground, as noted, that the evidence supported a finding that Wood was kicking Church while Archuleta was beating Church and shoving the tire iron into his rectum. That is sufficient to find that Wood encouraged or aided Archuleta in aggravated sexual assault.

## IV. LESSER INCLUDED OFFENSES

Finally, Wood contends that aggravated kidnapping and aggravated sexual assault, as predicate offenses of capital murder, are lesser included offenses of first degree murder and that Utah Code Ann. § 76–1–402(3) and the double jeopardy clauses of Article I, section 12 of the Utah Constitution and the Fifth Amendment to the United States Constitution prohibit the imposition of separate sentences for lesser included offenses.

A conviction of first degree murder requires proof of a statutorily defined aggravating circumstance in addition to an intentional and knowing killing. Utah Code Ann. § 76–5–202(1)(a)–(q). The aggravating circumstances alleged in this case were that the homicide was committed during the commission of, or flight from, several enumerated crimes, including aggravated sexual assault and aggravated kidnapping. Utah Code Ann. § 76–5–202(1)(d). Wood argues that since the jury found that aggravated sexual assault and aggravated kidnapping were aggravating circumstances, they were elements of the crime of first degree murder and that

the convictions of the two lesser crimes therefore merge into the murder conviction.

Utah Code Ann. § 76–1–402(3) provides that a defendant may not be convicted of both the offense charged and a lesser included offense. An offense is included when "[i]t is established by proof of the same or less than all the facts required to establish the commission of the offense charged." § 76–1–402(3)(a). In other words, the two crimes must be " 'such that the greater cannot be committed without necessarily having committed the lesser.' " *State v. Hill,* 674 P.2d 96, 97 (Utah 1983) (quoting *State v. Baker,* 671 P.2d 152, 156 (Utah 1983)).

In *Hill,* we held that whether an offense is a lesser included offense of another offense is determined "by comparing the statutory elements of the two crimes as a theoretical matter and, where necessary, by reference to the facts proved at trial." 674 P.2d at 97; *see also State v. McCovey,* 803 P.2d 1234, 1236 (Utah 1990); *State v. Branch,* 743 P.2d 1187, 1191–92 (Utah 1987). We applied that test in *State v. Shaffer,* 725 P.2d 1301, 1312–14 (Utah 1986), and concluded that the predicate or aggravating felony that made a homicide first degree or capital murder was a lesser included offense of first degree murder.

In *Shaffer,* the prosecution presented evidence that the defendant was guilty of first degree murder based on three possible aggravating circumstances—aggravated robbery, pecuniary gain, and other personal gain. The jury convicted the defendant of first degree murder but did not specify which aggravating circumstance or circumstances it relied on to find the defendant guilty. Because the jury specifically found the defendant guilty of aggravated robbery, the Court assumed that aggravated robbery served as the aggravating circumstance for the capital murder conviction. The Court held that aggravated robbery was the predicate felony of first degree murder and a lesser included offense because "[n]o additional facts or separate elements are required to prove aggravated robbery after first degree murder based on the predicate offense of aggravated robbery." *Id.* at 1313.

Nevertheless, *Shaffer* stated that a different result might obtain if it was clear that the jury specifically relied on more than one aggravating circumstance:

> If the aggravating circumstance or predicate felony for first degree murder is different from an additional offense charged, *there may be adequate independent grounds to convict the defendant of both offenses even though they arise out of a single criminal episode.* For example, if special verdict forms in this case had indicated that the jury relied on the "pecuniary" or "other personal gain" aggravating circumstances, the defendant could have been convicted of both first degree murder and aggravated robbery. Under that circumstance, aggravated robbery would not be a lesser included offense since the jury would not rely on the same facts to establish the elements of each crime.

*Id.* at 1314 n. 3 (emphasis added).

Unlike the jury in *Shaffer,* the jury in this case specifically found three aggravating circumstances—aggravated sexual assault, aggravated kidnapping, and that "the homicide was committed in an especially heinous, atrocious, cruel or exceptionally depraved manner." Utah Code Ann. § 76–5–202(1)(q). The State, relying on the above language in *Shaffer,* argues that because the jury expressly found as an aggravating circumstance that the homicide was committed in an especially heinous and depraved manner, the jury did not have to find that Wood also committed aggravated sexual assault or aggravated kidnapping to find him guilty of first degree murder, and therefore, the aggravated sexual assault and aggravated kidnapping convictions should not be merged into the capital murder conviction.

The language in *Shaffer* clearly does not compel the result argued for by the State. *Shaffer* stated that if the aggravating circumstance supporting a conviction of first degree murder is different from an additional offense that could also serve as a predicate felony for capital murder, a defendant *may* be convicted of the other offense *if* there are "adequate independent grounds to convict

the defendant of both offenses." *Shaffer*, 725 P.2d at 1314 n. 3 (emphasis added). In other words, the additional offense would not be held to be a lesser included offense as defined by § 76–1–402(3) if it did not have to serve as the predicate offense for capital murder. Here, both aggravated sexual assault and aggravated kidnapping were found to be predicate offenses of the capital homicide charge, and the defendant was also separately convicted of each crime. As predicate offenses, each was also a lesser included offense of the homicide charge. Nevertheless, it makes no sense, however, to merge both convictions when the law requires only one predicate offense.

■ We hold that Wood's aggravated kidnapping conviction does not merge with the murder conviction because it is not as closely related causally to the killing as the aggravated sexual assault, but that the aggravated sexual assault conviction does merge. *See Callis v. People*, 692 P.2d 1045, 1054 (Colo.1984). The facts supporting Wood's conviction of first degree murder are that Wood aided and abetted Archuleta directly in killing Church by kicking him in the jaw and inflicting wounds on·him during the beating and sexual assault that took his life. The facts proved in support of the aggravated kidnapping charge were not as closely related causally to the killing, although the victim was killed in the course of the kidnapping. The facts of the aggravated kidnapping are that Wood aided and abetted Archuleta in kidnapping Church by assisting Archuleta in loading and unloading items in and out of the trunk of the car so that Archuleta could bind Church and place him in the trunk. These acts occurred at an earlier time and in a different place and before it was clear that Wood had formed an intent to kill Church. Thus, the aggravated kidnapping conviction charge, while it could be a predicate offense, was not as closely tied

to the killing as was the aggravated sexual assault. *See State v. Branch*, 743 P.2d 1187, 1191 (Utah 1987).

■ As noted, the State argues that because the murder conviction was also supported by a finding that the murder was heinous and depraved, a separate aggravating circumstance of capital homicide, neither the aggravated sexual assault nor the aggravated kidnapping convictions should be merged with the murder conviction. However, the heinousness and depravity arose directly out of the aggravated sexual assault. We do not think it appropriate in this case to hold that the capital homicide conviction should be deemed to be supported solely by the aggravating circumstance of the heinousness and depravity of the murder when the rape with a tire iron, a significant factor contributing to Church's death, is primarily what supported the heinousness and depravity finding. In essence, the heinousness of the crime and the object rape were the same factually and should be treated legally for merger purposes as one aggravating circumstance.

■ It is not necessary under the Double Jeopardy Clause of the Fifth Amendment[4] to merge the aggravated kidnapping conviction with the murder conviction. Under the Fifth Amendment, "the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). The United States Supreme Court has also stated that if a "conviction of a greater crime ... cannot be had without conviction of the lesser crime, ... the Double Jeopardy Clause bars prosecution for the lesser crime after conviction of the greater one." *Harris v. Oklahoma*, 433 U.S. 682, 682, 97 S.Ct. 2912, 2913, 53 L.Ed.2d 1054 (1977) (per curiam). This test is essentially the same as that in Utah Code Ann. § 76–1–

4. Although Wood has argued that the double jeopardy clause of the Utah Constitution prohibits separate sentencing on the kidnapping and murder convictions, he has not argued or suggested that the Utah clause should be interpreted differently from the Double Jeopardy Clause found in the Fifth Amendment to the United States Constitution. We therefore analyze this issue solely under the federal constitution and federal law.

402(3). As stated, Wood's conviction of first degree murder can be supported without the aggravated kidnapping conviction because there were two other aggravated circumstances upon which the murder conviction could rest.

In sum, the aggravated sexual assault conviction was proved by the same facts that proved the capital homicide conviction, except for the homicide itself, and was more directly related causally to the homicide than the aggravated kidnapping. The aggravated sexual assault conviction therefore was a lesser included offense and merges into the homicide conviction.

The conviction for first degree murder is affirmed; the sentence for the aggravated kidnapping conviction is affirmed; the conviction and sentence for aggravated sexual assault are vacated because that conviction merged into the capital murder conviction.

HALL, C.J., and DURHAM, J., concur.

HOWE, Associate Chief Justice, concurring in part and dissenting in part:

I concur in parts I, II, and III of the majority opinion. I dissent as to part IV.

First degree murder "requires proof of a statutorily defined aggravating circumstance in addition to an intentional and knowing killing." *State v. Shaffer*, 725 P.2d 1301, 1313 (Utah 1986); *see* Utah Code Ann. § 76–5–202(1). The jury convicted Wood of first degree murder finding three such circumstances: (1) The death was caused while Wood was "engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit . . . aggravated sexual assault," *see* § 76–5–202(1)(d); § 76–5–405; (2) the death was caused while Wood was "engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit . . . aggravated kidnapping," *see* § 76–5–202(1)(d); § 76–5–302; and (3) the murder was committed in an "especially heinous, atrocious, cruel, or exceptionally depraved manner," *see* § 76–5–202(1)(q). The special verdict form indicates that the jury found each of these aggravating circumstances beyond a reasonable doubt.

The trial court sentenced Wood to life in prison for first degree murder and to consecutive minimum mandatory terms of ten years to life for his convictions of aggravated sexual assault and aggravated kidnapping. Relying on our decision in *Shaffer*, 725 P.2d at 1312–14, Wood contends that his convictions for first degree murder and the two underlying felonies violate section 76–1–402(3)(a) because the felonies are lesser included offenses of first degree murder as defined in section 76–5–202(1)(d). I agree.

Section 76–1–402(3) provides that "a defendant may be convicted of an offense included in the offense charged but may not be convicted of both the offense charged and the included offense." It further provides, "An offense is so included when . . . it is established by proof of the same or less than all the facts required to establish the commission of the offense charged." § 76–1–402(3)(a). In *Shaffer*, we addressed the application of this section to first degree felony murder convictions. In that case, the defendant was charged with intentionally and knowingly causing the death of the victim "while engaged in the commission of or an attempt to commit or flight after committing or attempting to commit Aggravated Robbery or Robbery or the homicide was committed for pecuniary or other personal gain." 725 P.2d at 1313. The jury convicted the defendant of first degree murder but did "not indicate which aggravating circumstance [it] relied upon to find [him] guilty." *Id.* However, because the jury had also convicted the defendant of aggravated robbery, we assumed that felony "served as an aggravating circumstance." *Id.*

The issue then arose "whether the predicate or underlying felony of felony murder is a lesser included offense thereby barring conviction of both first degree murder and the predicate felony." *Id.* at 1312. We held:

Under the facts of this case, therefore, proof of aggravated robbery was a necessary element to proof of first degree felony murder. . . . [U]nder the test for separateness found in section 76–1–402(3), aggravated robbery becomes a lesser included offense of first degree felony murder where . . . the predicate felony for first degree murder is aggravated robbery. No additional facts or separate elements are required to prove aggravated robbery af-

ter first degree murder based on the predicate offense of aggravated robbery is shown. Thus, first degree murder based on the predicate offense of aggravated robbery stands in a greater relationship to the lesser included offense of aggravated robbery. If the greater crime is proven, then the lesser crime merges into it.

*Id.* at 1313. Accordingly, we concluded that section 76–1–402(3) "prevents the defendant from being convicted and sentenced for aggravated robbery in addition to first degree murder where the aggravating circumstance is aggravated robbery." *Id.* at 1313–14.

The instant case poses a slightly different question. Wood was convicted of first degree murder based on the two enumerated felonies and the "heinousness" factor, the jury finding each of these aggravating circumstances beyond a reasonable doubt. Under section 76–5–202, one of these three aggravating circumstances alone would have been sufficient to elevate Wood's conduct from second to first degree murder. Not surprisingly, the State argues that the jury relied on the heinousness factor to convict Wood of first degree murder. Therefore, the argument continues, the two predicate felonies were not proved by the "same or less than all the facts" necessary to establish the commission of first degree murder. I agree that our decision in *Shaffer* does not compel this result. We cannot allow the State to *retrospectively* premise a first degree murder conviction on the nonfelonious aggravating circumstance in order to preserve convictions for felonies charged and proved as aggravating circumstances. Doing so would be completely arbitrary.

The majority, however, goes on to retrospectively decide that proof of aggravated sexual assault rather than the aggravated kidnapping was the predicate felony to Wood's first degree murder conviction and therefore must merge with that conviction as a lesser included offense. The basis for this decision is that the aggravated kidnapping was "not as closely related causally to the killing as the aggravated sexual assault." The majority reasons that the kidnapping was committed "at an earlier time and in a different place and before it was clear that

Wood had formed an intent to kill Church." I disagree with this analysis. Whether one underlying felony is more "closely related causally to the killing" than another is not the statutory test.

As explained, the statutory test for determining whether an offense stands in a lesser relationship to the offense charged is whether the offense is "established by proof of the same or less than all the facts required to establish the commission of the offense charged." Utah Code Ann. § 76–1–402(3)(a). To apply this standard, we "compare the statutory *elements* of the two crimes as a theoretical matter." *State v. Hill,* 674 P.2d 96, 97 (Utah 1983) (emphasis added). No "additional facts or separate *elements*" were required to prove aggravated kidnapping and aggravated sexual assault once Wood was convicted of first degree murder based on those predicate felonies. *Shaffer,* 725 P.2d at 1313 (emphasis added). Therefore, section 76–1–402(3) prevents Wood from being convicted of both first degree murder and the two predicate felonies to that crime. What the majority fails to recognize is that the statutory elements of aggravated kidnapping and aggravated sexual assault are the facts by which those crimes are established.

If the aggravated kidnapping had been the only predicate felony in this case, there is no question that it would have been a lesser included offense of first degree murder under section 76–1–402(3)(a). This is so despite the fact that it was not "closely related causally to the killing" and that it occurred "at an earlier time and in a different place and before it was clear that Wood had formed an intent to kill Church." *Shaffer* dictates this result. Yet, in the instant case, the majority concludes that the same aggravated kidnapping is not a lesser included offense, not because the kidnapping is proved by different facts or elements, but because a second predicate felony occurred closer in time and place to the killing and was more "closely related causally" to it.

The majority's decision to ignore section 76–1–402(3) is arguably reconciled by the fact that only one of the two underlying felonies was necessary to convict Wood of first degree murder. Once the predicate felony was

proved, the additional felony was not "established by proof of the same or less than all the facts required to establish [the first degree murder]." Utah Code Ann. § 76–1–402(3)(a). But which felony should we choose? The majority adopts the rule that the felony "most closely related causally to the killing" constitutes the predicate felony to first degree murder and therefore merges with that crime. It offers no explanation as to why this should be the standard. Other courts have adopted different rules, each as arbitrary as the one embraced by the majority today. *Callis v. People,* 692 P.2d 1045, 1054 (Colo.1984) ("When a defendant is convicted of multiple felonies, all of which are alleged as the legal predicates for the commission of felony murder, that felony which most directly contributes to the death of the victim should serve as the essential element of the felony murder conviction."); *Small v. State,* 458 So.2d 1136 (Fla.Dist.Ct.App.1984) (where defendant was convicted of felony murder and two underlying felonies, court vacated the "less serious offense" as the lesser included offense of felony murder); *Blankenship v. State,* 247 Ga. 590, 277 S.E.2d 505, 507–08 (1981) (to determine which of multiple felonies formed the basis of felony murder conviction, court should look first to the indictment or, if it is not specified therein, to the evidence, determining which crime was "the initial felony which began the chain of circumstances which ultimately led to the death of the victim"), *overruled by Thompson v. State,* 263 Ga. 23, 426 S.E.2d 895, 897 (1993) ("where it is unclear which of two or more felonies is the underlying felony for a felony murder conviction, the trial court must merge the most severe (in terms of potential punishment)" because in such circumstances, there "is no logical rule to be applied in making a determination regarding the jury's intent" and the resulting ambiguity "must be construed in the defendant's favor").

The legislature could answer this question by indicating its intent to impose or not to impose multiple punishments for multiple predicate felonies. Likewise, special verdict forms could require the jury to assign "predicate" status to one aggravating circumstance or enumerated felony. However, in the absence of such a form or legislative intent, there is no principled basis upon which we can determine which one of multiple felonies constitutes the necessary element of first degree murder. We are thus left with the only nonarbitrary rule—to merge *all* predicate felonies with a first degree murder conviction. *All* of them meet the definition of an included offense under section 76–1–402(3)(a).

It is true that in *State v. McCovey,* 803 P.2d 1234, 1239 (Utah 1990), we held that the predicate felony to *second* degree felony murder was not a lesser included offense of *second* degree murder. We did so in the face of our prior holding in *Shaffer,* 725 P.2d at 1313–14, that the predicate felony to *first* degree murder was a lesser included offense and therefore merged with a *first* degree murder conviction. To reach that result, we relied on the facts that (1) there were in *McCovey* separate victims of the predicate felony (aggravated robbery) and the murder, and (2) second degree murder, unlike first degree murder, does not carry a death sentence or life imprisonment where any additional sentences would be surplusage and unnecessary. However, Justices Durham and Zimmerman dissented on the ground that however desirable the majority's result may be, section 76–1–402(3)(a) precluded it since "[i]t is not possible to convict a defendant of killing while committing an aggravated robbery without proving the facts of the felony of aggravated robbery." *McCovey,* 803 P.2d at 1240.

This writer joined the majority in *State v. McCovey.* However, neither of the factors which we relied on to reach our result of nonmerger is present in the instant case. I am thus left to conclude that under the plain wording of section 76–1–402(3)(a), Wood's conviction of aggravated kidnapping did merge with his first degree murder conviction. In this conclusion, I am supported by an observation made by the Idaho Supreme Court in *Sivak v. State,* 112 Idaho 197, 731 P.2d 192 (1986). *Sivak* held that under Idaho case law defining what constitutes an included offense (similar to our section 76–1–

402(3)(a)), the defendant's conviction of robbery merged with his conviction of first degree felony murder. Said the court:

Our holding on this issue makes sense because without the robbery, the state would have received only a second degree murder conviction against Sivak. And with it, a much lighter punishment. However, because of the robbery, the state sought and received a first degree murder conviction carrying a more severe penalty. Thus, Sivak, in essence, is being punished for the robbery by way of the punishment he received for the felony murder offense. 731 P.2d at 207–08.

I would vacate Wood's conviction of aggravated kidnapping as well as his conviction of aggravated sexual assault.

ZIMMERMAN, J., concurs in the dissenting opinion of HOWE, A.C.J.